**CITIZENS FOR THE ABATEMENT OF AIRCRAFT NOISE, INC., et al., Plaintiffs,**

v.

**METROPOLITAN WASHINGTON AIRPORTS AUTHORITY, et al., Defendants.**

Civ. A. No. 88–3319.

United States District Court, District of Columbia.

July 20, 1989.

ed by an array of novel situations. Within the last few years, the Court has upheld the constitutionality of a Sentencing Commission within the Judicial Branch composed of judges and others appointed by the President and charged with the duty of formulating guidelines for sentencing of federal offenders, *Mistretta v. United States,* —— U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); has rejected a challenge to an independent counsel located within the Judicial Branch to investigate and prosecute crimes committed by Executive Branch officials, *Morrison v. Olson,* —— U.S. ——, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); and has approved a law allowing a federal agency to adjudicate state law counterclaims arising in connection with administrative proceedings, *Commodity Futures Trading Commission v. Schor,* 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986).

This case features yet another unusual institution. In transferring two federally-owned airports to an interstate authority, Congress required that the lease describing the transfer provide for a review board composed of nine members of Congress with veto power over the state authority. The compacting states agreed to this condition and created the review board. The Court is now called upon to determine whether the federal statute authorizing the transfer of the airports violates the Constitution. For the reasons articulated below, the Court concludes that it does not.

Patti A. Goldman, Alan B. Morrison and Eric R. Glitzenstein, Public Citizen Litigation Group, Washington, D.C., for plaintiffs.

William T. Coleman, Jr., Donald T. Bliss and Debra A. Valentine, O'Melveny & Myers, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

The Supreme Court's recent separation of powers jurisprudence has been populat-

## I. Background

Three major commercial airports serve the Washington, D.C. area. The oldest is Washington National Airport (National), which was opened in 1941 just across the Potomac River from the District of Columbia in Virginia. Baltimore–Washington International Airport (BWI), formerly known as Baltimore Friendship Airport, is situated halfway between the District of Columbia and Baltimore, Maryland in the Maryland suburbs. Washington Dulles International Airport (Dulles), located in the suburbs of

Virginia, began operations in 1962. Although every other commercial airport in the United States is operated by a regional, state or local authority, National and Dulles were placed under the ownership and control of the federal government.[1] The Federal Aviation Administration (FAA), a component of the Department of Transportation, undertook this responsibility.

Ever since the two airports opened, plans to extricate National and Dulles from federal control have surfaced. None succeeded. In June 1984, however, the combination of rising federal budget deficits and the need for immediate and significant improvements of the facilities at National and Dulles led Secretary of Transportation Elizabeth Dole to form an advisory commission composed of public leaders and aviation officials to explore the transfer issue. On December 18, 1984, the Holton Commission, named after its Chairman, former Virginia Governor A. Linwood Holton, Jr., issued a report whose main recommendations were (1) that National and Dulles be transferred to a single independent public authority with the ability to issue tax-exempt bonds to raise revenue for capital improvements; (2) that the transfer should be effected by means of a long term lease; and (3) that the new entity should be administered by a governing board made up of non-political members appointed by local officials. *See* Plaintiffs' Exhibit (Pl.Ex.) 2.

The momentum generated by the Holton Commission's report spurred legislative activity on two fronts. On April 3, 1985 the Governor of Virginia approved a law authorizing creation of a regional airports authority along the lines suggested by the Holton Commission to acquire National and Dulles from the federal government. 1985 Va. Acts ch. 598. Almost-identical legislation was passed by the City Council of the District of Columbia; it was signed by the Mayor on October 9, 1985 and became effective on December 3, 1985. D.C. Law

6–67 (1985). In the meantime, the Congress was also taking action. A bill was introduced in the Senate on April 26, 1985 conveying the Reagan Administration's proposal for transferring National and Dulles. *See* 131 Cong. Rec. 9607 *et seq.* Hearings were held before the Senate Committee on Commerce, Science and Transportation in June and July of 1985, and the version of the bill that was approved by the committee embodied the recommendations of the Holton Commission "[i]n all significant respects." S.Rep. No. 193, 99th Cong., 1st Sess. 2 (1985). The measure was debated in, amended by and passed the full Senate on April 11, 1986. 132 Cong. Rec. 7276.

The focus then shifted to the House, where the Committee on Public Works and Transportation held its own hearings in June 1986. Shortly thereafter, however, the Department of Transportation sought guidance from the Justice Department concerning several proposals to create a board, whose members would be drawn from the House and Senate, with veto power over certain decisions of the airports authority. The Assistant Attorney General for Legislative and Governmental Affairs, John R. Bolton, issued a letter opinion discussing the alternatives and concluding that one of the three was constitutional. Pl.Ex. 3. A new bill, now containing a provision for a Congressional review board, passed the Senate on October 3, 1986 and the House on October 15, 1986 as part of an appropriations rider. *See* 132 Cong. Rec. S14,862–64 & H11098–106 (daily ed.). After being signed by the President, the Metropolitan Washington Airports Act of 1986 (the Airports Act or the Act) became law.[2]

## II. The Airports Act

Concluding that National and Dulles "constitute an important and growing part of the commerce, transportation, and economic patterns of the Commonwealth of Virginia, the District of Columbia, and the

---

**1.** BWI, for example, is owned by the State of Maryland.

**2.** Pub.L. No. 99–500, 100 Stat. 1783–373, reenacted in Pub.L. No. 99–591, 100 Stat. 3341–376.

For simplicity, references to specific provisions of the Act, which is codified at 49 U.S.C. App. §§ 2451–2461, will be cited as "§ ____" or "section ____."

surrounding region" and that the federal government had a "continuing but limited interest" in the two airports, § 2451(1) & (3), Congress passed the Airports Act to

    authorize the transfer of operating responsibility under long-term lease of the two [airports] as a unit ... to a properly constituted independent airport authority created by the Commonwealth of Virginia and the District of Columbia, in order to achieve local control, management, operation, and development of these important transportation assets.

§ 2452(a). To that end, the Act authorizes the Secretary of Transportation to enter into a 50-year lease for the transfer of the airports to the aforementioned Airports Authority and states that the lease "shall provide" for the payment of $3 million per year from the Authority to the United States Treasury. § 2454(a) & (b).[3] In addition, the Act provides that the Airports Authority "shall agree, at a minimum" to certain "terms and requirements" contained in the lease. § 2454(c). Among other things, the Authority is required to operate National and Dulles "as a unit," to use the property only for airport purposes, to adhere (with certain exceptions) to all applicable FAA regulations, and to assume all rights, liabilities and obligations of National and Dulles. *Id.*

Section 2456 of the Act is entitled "Airports Authority," and its provisions lie at the heart of the instant case. The section begins:

    The Airports Authority shall be a public body corporate and politic, having the powers and jurisdiction as are conferred upon it jointly by the legislative authority of the Commonwealth of Virginia and the District of Columbia ... but at a minimum meeting the requirements of this section.

§ 2456(a).[4] It provides that the Airports Authority shall be (1) "independent" of Virginia, the District of Columbia and the federal government and (2) "a political subdivision constituted solely to operate and im-

prove both [National and Dulles] as primary airports serving the Metropolitan Washington area." § 2456(b). In section 2456(c), the Authority is granted general authority to operate and is empowered to "acquire, maintain, improve, operate, protect, and promote" the two airports; to issue bonds; to acquire real and personal property; to levy fees or other charges; and to make agreements with employee organizations. Whenever the Authority takes an action "changing, or having the effect of changing, the hours of operation of or types of aircraft serving either of the [airports]," it must do so by regulation. § 2456(g).

The Authority is administered by an 11-member Board of Directors. § 2456(e)(1). Five are appointed by the Governor of Virginia, three by the Mayor of the District of Columbia, two by the Governor of Maryland, and one by the President with the advice and consent of the Senate. *Id.* Members (who serve staggered, six-year terms) are prohibited from holding elective or appointed office, may not receive compensation for their service, and must (with the exception of the member appointed by the President) reside within the Washington Standard Metropolitan Statistical Area. § 2456(e)(2) & (3). The Chairman is chosen by majority vote of all members. § 2456(e)(1).

The Act also provides that the Board of Directors "shall be subject to review of its actions and to requests" by a Board of Review, which "shall be established by the Board of Directors." § 2456(f)(1). The Board of Review consists of (1) two members from both the House Committee on Public Works and Transportation and the Committee on Appropriations, chosen from a list provided by the Speaker of the House; (2) two members from both the Senate Committee on Commerce, Science and Transportation and the Committee on Appropriations, from a list provided by the President *pro tempore* of the Senate; and (3) one member from the House of Repre-

---

**3.** The Act also allows for extension of the term of the lease. § 2459.

**4.** In another section, the Act permits the State of Maryland to enter an agreement to include BWI in the Authority. § 2452(b).

sentatives and Senate as a whole, from lists provided by the Speaker and the President *pro tem. Id.* Members from the Congressional committee serve staggered, six-year terms, while the "at large" member (whose seat alternates between the House and the Senate) serves a two-year term. § 2456(f)(2). No Senator or Representative from Virginia or Maryland, nor the delegate from the District of Columbia, may serve on the Board of Review. § 2456(f)(1). The Act states that the members serve "in their individual capacities, as representatives of users of [National and Dulles]." *Id.*

The Airports Act also describes the parameters of the relationship between the Board of Review and the Board of Directors. Whenever, for example, the Board of Directors seeks to adopt a budget, issue bonds, adopt, amend or repeal a regulation, adopt or revise a master plan, or appoint a chief executive officer, it must submit that action for approval by the Board of Review. § 2456(f)(4).[5] In addition, Board of Review members may participate as nonvoting members in meetings of the Board of Directors and may request the Authority to vote or report on any matter related to the airports. § 2456(f)(5) & (6). Finally, the Act states that, if the Board of Review "is unable to carry out its functions under this subchapter by reason of a judicial order," the Board of Directors "shall have no authority to perform" any of the five actions that they are required to submit to the Board of Review for approval. *See* § 2456(h).[6]

### III. Developments Since Passage of the Act

The Secretary of Transportation and the Airports Authority entered into a lease for the transfer of National and Dulles on March 2, 1987, *see* Defendants' Exhibit (Def. Ex.) 3, and the Authority adopted by-laws to govern its operations two days later. Def. Ex. 4. Thereafter, Virginia and the District of Columbia enacted laws, on April 8, 1987 and June 1, 1987 respectively, amending the legislation that they originally passed authorizing the Airports Authority. *See* 1987 Va. Acts ch. 665; D.C. Law 7–18 (1987). On June 3 and September 2, 1987, the Board of Directors selected the members of the Board of Review from lists provided by the Speaker of the House and the President *pro tem* of the Senate. *See* Pl. Exs. 9 & 10.[7]

The Authority proposed a Master Plan for the renovation of National and Dulles in October 1987. After receiving comments from the public, *see, e.g.*, Pl.Ex. 17, the Board of Directors adopted a resolution approving the Plan on March 13, 1988. Def. Ex. 7. At a regular meeting held on April 13, 1988, the Board of Review discussed the Plan and voted not to disapprove it. Pl.Ex. 18. The Authority has begun to implement the Plan since that time.

### IV. The Instant Case

This lawsuit was filed on November 16, 1988. Plaintiffs are the Citizens for the Abatement of Aircraft Noise, Inc. (CAAN), and two of its members, John W. Hechinger, Sr. and Craig H. Baab. A non-profit organization of citizens and groups, CAAN seeks to achieve "balanced service at the [Washington, D.C.] area's three airports" and to "reduce aircraft operations at Washington National Airport, and alleviate the noise, safety problems and air pollution that result from such operations." Complaint ¶ 3. Naming the Airports Authority

---

**5.** If the Board of Review does not disapprove the action within 30 days, it takes effect; if an action is disapproved, the Board of Review must state the reasons for its decision. *Id.*

**6.** The Act also contains a separability provision: Except as provided in section 2456(h) of this title, if any provision of this subchapter or the application thereof to any person or circumstance, is held invalid, the remainder of this subchapter and the application of such provision to other persons or circumstances shall not be affected thereby.
§ 2460.

**7.** The House members are William Lehman, Silvio O. Conte, John Paul Hammerschmidt, Norman Y. Mineta and Dan Rostenkowski; the Senate members are Robert C. Byrd, Nancy L. Kassebaum, Ted Stevens and Ernest F. Hollings. *Id.*

and the Board of Review as defendants, plaintiffs contend that the power of the Board of Review found in section 2456(f)(4) to disapprove actions of the Authority violates the bicameralism requirement of Article I, §§ 1 and 7 of the Constitution, the Presentment Clauses of Article I, § 7, clauses 2 and 3, and the doctrine of separation of powers. Complaint ¶ 22. Plaintiffs seek a declaratory judgment and injunctive relief enjoining the Board of Review from taking any actions under the Act and forbidding the Airports Authority from taking any action (including implementation of the Master Plan) that it ordinarily would submit for approval to the Board of Review. *Id.* at 9. Defendants filed their answer to the complaint on December 16, 1988; cross-motions for summary judgment followed.[8]

## V. Discussion

### A. Threshold Arguments

Defendants maintain that this case should be dismissed for lack of jurisdiction because plaintiffs' lawsuit is not ripe for judicial review, because plaintiffs have failed to exhaust their administrative remedies and because plaintiffs lack standing to assert their claims. None of these arguments has merit.

■ Defendants' first two contentions warrant little discussion. With respect to ripeness, they note that, although plaintiffs allege in this suit that the Board of Re-

view's veto power over the Authority is unconstitutional, the Board of Review has never exercised its power to plaintiffs' detriment. Defendants therefore argue that "there is no confrontation requiring judicial intervention" and that plaintiffs' case "lacks the concreteness necessary to establish ripeness" because it rests on speculation that the Board of Review may one day veto an action of the Authority and cause them harm. Motion for Summary Judgment at 13. The Court must disagree. While the Board of Review has not disapproved an action to plaintiffs' detriment, that does not preclude a showing of ripeness. To the contrary, this case is as ripe as it ever will be. Congress has passed a law establishing an Airports Authority and a Board of Review. Plaintiffs maintain that one aspect of the law—the veto power wielded by the Board of Review over the Authority—violates several provisions of the Constitution. Defendants nowhere suggest, nor can the Court discern, how the particular manner in which the veto power is exercised will affect the constitutionality *vel non* of the body that exercises it.[9] This is also not a situation where the possibility of a veto is abstract or ephemeral, for the Board of Review has already acted to disapprove one resolution passed by the Board of Directors. *See* Pl.Ex. 11.

■ Citing *Williamson County Planning Comm'n v. Hamilton Bank*, 473 U.S.

8. The parties are to be commended for the high caliber of the briefs that they have submitted.

9. Because plaintiffs challenge one discrete provision of the Airports Act, this is not a case like *Hastings v. Judicial Conference of the United States*, 770 F.2d 1093, 1101 (D.C.Cir.1985), *cert. denied*, 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986), in which the court was asked "to pass on the constitutionality of an entire Act of Congress that vests in an entity a host powers." Nor, given that Congress has already enacted the veto provision under attack, is this a case like *Brown v. Hotel & Restaurant Employees & Bartenders International Union Local 54*, 468 U.S. 491, 512, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984), *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018–19, 104 S.Ct. 2862, 2880–81, 81 L.Ed.2d 815 (1984), or *Muller Optical Co. v. EEOC*, 743 F.2d 380, 387–88 (6th Cir.1984), all of which involved potential conflicts that could have been avoided. Finally, defendants' empha-

sis on "concreteness" is misplaced, since (as their own cases make clear) that requirement arises under the law of standing, not under the ripeness doctrine. *See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 485–86, 102 S.Ct. 752, 765–66, 70 L.Ed.2d 700 (1982) (concreteness arises from "proceedings commenced by one who has been injured in fact"; plaintiffs lacked standing because they had not alleged an *injury of any* kind) (emphasis in original); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804, 105 S.Ct. 2965, 2970, 86 L.Ed.2d 628 (1985) ("federal standing requires an allegation of a present or immediate injury in fact, where the party requesting standing has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues'") (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)).

172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) and *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), defendants next assert that plaintiffs have failed to exhaust their administrative remedies because plaintiffs are participants in an ongoing study of noise problems being conducted by the Authority and will be able to comment on any recommendations that are proposed. Motion at 16 n. 12. The cases cited by defendants are inapposite, however. In *Williamson,* a landowner alleged that a local zoning law amounted to an unconstitutional taking of property under the Fifth Amendment but had not obtained a final decision that he would not receive a variance. The Supreme Court held that exhaustion was necessary because of "the very nature of the inquiry required by the Just Compensation Clause"—an inquiry examining "the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations." 473 U.S. at 190–91. The instant case requires none of those fact-bound determinations. *McKart* is even weaker authority, for there the Court *rejected* the government's claim that the exhaustion doctrine barred a *criminal* defendant from presenting a defense that he did not raise in the administrative context. 395 U.S. at 196–97. But even were exhaustion appropriate, defendants' claim that the noise study is "specifically designed to address the alleged injuries of which [plaintiffs] complain," Motion at 16 n. 12, is only partially correct. While plaintiffs are concerned with reducing noise at National and Dulles, they also contend that the exclusion of local representatives from the Board of Review "has diminished the influence that CAAN and its members have over decisions concerning the operation of the airports." Complaint ¶ 21. The ongoing noise study could not, of course, address that claim.

■ The matter of standing is a closer question. The federal judicial power is limited to "cases" and "controversies" arising under the Constitution and laws of the United States. Article III, § 1. In its most basic form, the doctrine of standing asks "whether the litigant is entitled to

have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Aside from certain prudential limitations, a party seeking to litigate in federal court must, at a constitutional minimum, allege "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Although defendants argue that plaintiffs have satisfied neither of these requirements, the Court must disagree.

As noted above, CAAN is primarily concerned with the adverse effects of operations at National Airport. As one of its members explains:

4. Most of CAAN's members live under the flight path going to and from National Airport. They are also adversely affected by the traffic congestion resulting from passenger activity at that airport. Some have developed health problems that they attribute to the air traffic, and others' property values have suffered as a result of their proximity to the airport or its flight path.

5. CAAN's members generally favor a nighttime curfew on air traffic and reduction in the level of daytime air traffic at National Airport, accompanied by an expansion of air services available at Dulles [and BWI].

6. The Airports Authority's Master Plan for National Airport will injure CAAN's members further because it proposes to expand the airport's facilities, to build them to accommodate wide-bodied jets, to increase passenger levels, and to increase air carrier traffic by utilizing currently unused slots.

Affidavit of Sherwin Landfield, Pl.Ex. 13, ¶¶ 4–6. Defendants maintain, however, that plaintiffs' injuries are not caused by the Master Plan. They assert that the Plan is a "noise neutral" map for the renovation of National which does not contemplate the building of any new runways, gates or terminals. According to defendants, decisions about the number and type

of aircraft using National, the amount of passengers carried, and the precise landing and takeoff patterns are made by the FAA, the airline companies and the marketplace but *not* by the Master Plan. That may be so, but the Plan contains other features. A taxiway turnoff will be added "[t]o reduce aircraft time on the runway and thus improve capacity." Pl.Ex. 16 at 10. The airports' gates will be remodeled to accommodate new "widebody" airplanes. Affidavit of James A. Wilding, Def. Ex. 8, ¶ 6. And the size of existing terminals and available parking spaces would be almost doubled. Pl.Ex. 16 at 5. Thus, while defendants are correct in stating that the Plan itself will not *cause* an expansion in air traffic at National, it is also true that an increase in both passengers and flights could *not* occur without the significant improvements contemplated by the Plan. Moreover, forecasts prepared for the Master Plan recognize that an *increase* in flights and passengers will in fact take place, *see* Pl. Exs. 16 at 2; 24 at 12; 25 at II–12. Because defendants nowhere challenge plaintiffs' contention that they are harmed by noise, air pollution and the safety problems associated with flights to and from National, and because the Master Plan will facilitate increased air travel to the airport, their alleged injuries are "fairly traceable" to the Master Plan.

Defendants also assert that granting plaintiffs the relief they seek—an injunction barring implementation of the Plan and precluding the Authority from taking any actions that it would normally submit to the Board of Review for approval—would not redress their injuries because the Authority would be then unable to take any action to remedy the noise situation at National. But if the Authority may not issue bonds or adopt a budget, continued construction at National would cease, the additional capacity otherwise possible would be halted, and plaintiffs' asserted injuries would be averted. Plaintiffs therefore meet both aspects of the standing inquiry.

Plaintiffs have standing for yet another reason. As the Supreme Court observed in *Buckley v. Valeo*, 424 U.S. 1, 117, 96 S.Ct. 612, 681, 46 L.Ed.2d 659 (1976), "[p]arty litigants with sufficient concrete interests at stake may have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights." In addition to their concerns regarding air traffic at National, plaintiffs also contend that the veto power of the Board of Review "diminished the influence" of CAAN over airports issues because no local Congressmen or Senators may be selected for the Board. Complaint ¶ 21. A similar claim was recognized in *National Anti–Hunger Coalition v. Executive Committee of the President's Private Sector Survey on Cost Control*, 711 F.2d 1071 (D.C.Cir.1983). There, an organization devoted to hunger issues and two low-income individuals brought suit contending that a presidential commission had failed to comply with the Federal Advisory Committee Act's requirement that its membership be "fairly balanced." The district court found that plaintiffs had standing, and the court of appeals noted that "[t]he standing question is a close one that we need not resolve to decide this appeal, but we are inclined to agree with the District Court's conclusion." 711 F.2d at 1073–74. In a footnote explaining its "inclination to agree," the court observed that FACA

> confers no cognizable personal right to an advisory committee appointment. But, [as] the legislative history makes clear, the "fairly balanced" requirement was designed to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee. When the requirement is ignored, therefore, persons having a direct interest in the committee's purpose suffer injury-in-fact sufficient to confer standing to sue.

*Id.* at 1074 n. 2 (citations omitted). Defendants correctly observe that this case does not arise under FACA and that the Airports Act does not contain a "fairly balanced" requirement. The Act does make plain, however, that the Authority was created in part to protect the interests of local

residents such as the members of CAAN.[10] Although the Board of Directors contains local representatives, the Board of Review does not. § 2456(f)(1). If, therefore, the Board of Review is unconstitutional, the veto power it possesses would dilute the local interests' representation mandated by the Act. Plaintiffs therefore have standing under the Act to assert this additional injury.

### B. The Merits

1. The Framers of our Constitution "knew that '[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointive or elective, may justly be pronounced the very definition of tyranny.'" *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 859–60, 106 S.Ct. 3245, 3261, 92 L.Ed.2d 675 (1986) (Brennan, J., dissenting) (quoting *The Federalist*, No. 46 at 334 (H. Dawson ed. 1876) (J. Madison)). That document accordingly divides the powers of the National Government into three coordinate spheres: Legislative, Executive and Judicial.[11] This system "was deliberately structured to assure full, vigorous, and open debate on the great issues affecting the people and to provide avenues for the operation of checks on the exercise of governmental power." *Bowsher v. Synar*, 478 U.S. 714, 722, 106 S.Ct. 3181, 3186, 92 L.Ed.2d 583 (1986). In the now-famous words of Justice Jackson, the tripartite arrangement seeks to "diffuse[ ] power the better to secure liberty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

The Supreme Court has developed a number of constitutional guides to preserve and maintain the independence of the Branches, and plaintiffs assert that two are implicated here. The most familiar is the doctrine of separation of powers, which in its fundamental formulation requires that "in the actual administration of the government Congress or the Legislature should exercise the legislative power, the President or the State executive, the Governor, the executive power, and the Courts or the judiciary the judicial power." *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928). Plaintiffs contend that the Airports Act transgresses this mandate because the Board of Review, which is composed entirely of members of Congress, reviews decisions by the Board of Directors involving the issuance of regulations, the adoption of the Master Plan and the formation of budget plans. In their view, the Act violates the proscription noted by the Supreme Court in *Springer v. Government of the Philippine Islands*, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928), that "the legislature cannot engraft executive duties upon a legislative office." *Id.* at 202, 48 S.Ct. at 482.

The Supreme Court has also made clear that "the legislative power of the Federal Government [must] be exercised in accord with a single, finely wrought and exhaustively considered, procedure." *INS v. Chadha*, 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983). This procedure is contained in the Bicameralism requirement, which mandates that all bills "shall have passed the House of Representatives and the Senate," Art. I, § 7, cl. 2, and the Presentment Clauses, which provide that thereafter all bills, orders and resolutions "shall be presented to the President of the United States." *Id.* cls. 2 & 3. In *Chadha*, the Supreme Court described these provisions as an "unmistakable ex-

---

**10.** The Act states that "any change in status of the two airports must take into account the interest of nearby communities ... and other interested groups," recognizes the "limited need for a Federal role ... and the growing local interest," and notes that the Authority "will improve communications with local officials and concerned residents regarding noise" at National and Dulles. § 2451(6), (7) & (8).

**11.** Article I, Section 1 provides that "[a]ll legislative Powers shall be vested in a Congress of the United States." Article II, Section 1 states that "[t]he executive Power shall be vested in a President of the United States." And Article III, Section 1 holds that "[t]he judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."

pression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process," 462 U.S. at 959, 103 S.Ct. at 2788, which must be adhered to whenever Congress engages in "an exercise of legislative power." *Id.* at 952, 103 S.Ct. at 2784.[12] Plaintiffs maintain that the veto power possessed by the Board of Review amounts to "an extra-constitutional check on the execution of the law" in violation of *Chadha.* Motion at 23.

Before assessing the validity of these arguments, the Court pauses to note the gravity of this undertaking. As Justice Stevens has observed, "[w]hen [a court] is called upon to invalidate a statutory provision that has been approved by both Houses of Congress and signed by the President ... it should only do so for the most compelling constitutional reasons." *Bowsher,* 478 U.S. at 736, 106 S.Ct. at 3193. (Stevens, J., concurring). There accordingly exists a "presumption that the challenged statute is valid," *Chadha,* 462 U.S. at 944, 103 S.Ct. at 2780, as well as an understanding that "an Act of Congress ought not to be construed to violate the Constitution if any other possible construction remains available." *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 500, 99 S.Ct. 1313, 1318, 59 L.Ed.2d 533 (1979). These devices ensure that "[t]he courts will ... not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council,* 485 U.S. 568, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988). With these standards in mind, and having considered the arguments presented by the parties, the Court finds that the veto power of the Board of Review is constitutional.

█ Plaintiffs' arguments rest on two fundamental premises. One is their view that the Board of Review is a legislative office under the control and direction of Congress. Plaintiffs state, for example, that in creating the Board of Review Congress "retained the power to veto the [Airports] Authority's major actions." Motion at 23. They describe the Board as "an arm" and as "an agent" of Congress. *Id.* at 26. Plaintiffs' other assumption is that the creation of the Board of Review was compelled by passage of the Airports Act. They assert that "the Board is mandated by federal law," Reply Brief at 2, and contend that the Airports Authority was "directed by statute and lease to establish a congressional Board of Review." *Id.* at 6. Neither of plaintiffs' theories is well-founded, however.

Our examination begins, as it must, with the language of the Airports Act. The statute provides that the Airports Authority is "independent of the Commonwealth of Virginia and its local governments, the District of Columbia, and the Federal Government." § 2456(b)(1). It further states that the Board of Review must consist of Congressmen acting "in their individual capacities, as representatives of users of [National and Dulles]." § 2456(f)(1).[13] These words, which are clear and unequivocal, emphasize the Board's independence: it is not beholden to Congress. Invoking a familiar rule of construction, defendants suggest that the plain meaning of the Act should govern and further investigation cease. The cases on which they rely involve differing interpretations of *statutory* provisions. In the constitutional context the Supreme Court has cautioned that "separation-of-powers analysis does not turn on the labelling of an activity," *Mistretta v. United States,* — U.S. —, 109 S.Ct. 647, 665, 102 L.Ed.2d 714 (1989), but rather "focuse[s] on the 'unique aspects of the congressional plan at issue and its practical consequences.'" *Id.* (citing *Schor,* 478 U.S. at 857, 106 S.Ct. at 3260 (1986)). The inquiry therefore continues.

---

12. The Court struck down a law which allowed either House of Congress to invalidate a decision by the Attorney General that a deportable alien should be allowed to remain in the United States. 462 U.S. at 952–59, 103 S.Ct. at 2784–88.

13. The independence of the Board is also reiterated in the Authority's Bylaws as well as the lease it negotiated with the Department of Transportation. *See* Def. Ex. 3, art. 13.A, and Def. Ex. 4, art. IV, § 1.

984

The structure of the Airports Act also discloses the independence of the Board of Review. Although the Board of Review is composed of members of Congress, Congress does not appoint them. Rather, the Board of Directors of the Airports Authority—a group selected by local leaders (except for one Presidential appointee)—establishes the Board of Review. § 2456(f)(1). Moreover, Congress may not remove any of the members of the Board of Review. The statute is silent on this point and, in accord with well-recognized principles of both federal and state law,[14] that silence indicates that the body which appointed the members of the Board of Review (in this case, the Board of Directors) retains the power to remove them.[15] This power of removal is significant for, in concluding that the Comptroller General was "subservient to Congress" in *Bowsher*, the Supreme Court observed that "[t]he critical factor" was the provision allowing for his removal by Congress. 478 U.S. at 727, 106 S.Ct. at 3188. In addition, it bears repeating that the Board of Review is just that—a *review* body. Although it can request a vote or study by the Board of Directors, § 2456(f)(5), the Board of Review only possesses disapproval power and cannot compel the Airports Authority to take any particular action. Finally, members of the Board of Review do not receive any additional compensation beyond their Congressional salaries, are not required to report to Congress about their activities, and are not granted any fixed budget by the Act.

Plaintiffs' arguments to the contrary are unpersuasive. They initially contend that Congressional control is evident because the Board of Review has held all of its meetings on Capitol Hill and because members have responded to inquiries from the public about the Board using official Congressional stationary. But these activities do not show control in the constitutional sense of either the power to appoint or the power to remove but rather simply reflect the fact that all of the members of the Board of Review are also members of Congress. As the Supreme Court has noted in a different context, the Constitution "does not forbid [Congressmen] from wearing two hats; it merely forbids them from wearing both hats at the same time." *Mistretta*, 109 S.Ct. at 671. Plaintiffs next maintain that the Board of Directors' appointment power is illusory (and Congressional control evident) because the Board of Directors must make its appointments to the Board of Review from lists provided by the Speaker of the House and the President *pro tem* of the Senate and because eight of the nine members must come from committees with oversight over airport matters. In both *Bowsher* and *Mistretta*, however, the Supreme Court expressed no qualms about similarly-limited lists that were provided to the President for appointment purposes.[16] In addition, plaintiffs' protestations notwithstanding, there is nothing unseemly about the requirement that most of the members of the Board of Review come from committees with jurisdiction over aviation issues, in view of their familiarity (and possible expertise) with the types of problems likely to confront all users of National and Dulles.[17] And it should also be reiterated that the Board of Directors' appointment power is not illusory, for it is free under the Act to reject a candidate submitted for the Board of Review if the nominee is deemed unsuitable for some rea-

**14.** *See Carlucci v. Doe*, —— U.S. ——, 109 S.Ct. 407, 411, 102 L.Ed.2d 395 (1988); Va.Code § 24.1–79.6.

**15.** The resolutions passed by the Board of Directors appointing the members of the Board of Review reflect this power; they state that "the Board of Directors may remove for cause an appointee to the Board of Review prior to the conclusion of his term." Pl. Exs. 9 & 10.

**16.** *See* 478 U.S. at 727, 106 S.Ct. at 3188 (Comptroller General appointed from list of three pro-

vided by Speaker and president *pro tem* ); 109 S.Ct. at 674 n. 31 (Judicial Conference submits names of six judges for three appointments to Sentencing Commission).

**17.** The Court is not troubled by the fact that local members of Congress may not serve on the Board of Review. The Act specifically directs that local interests be taken into account in airport decisions, *see supra* note 10, and each of the Board of Directors (with one exception) is appointed by local officials.

son.[18] Plaintiffs' argument with respect to the Authority's appointment power is unpersuasive. Finally, plaintiffs claim that certain statements made during floor debate on the Airports Act establish that the true purpose of the Board of Review was perpetuation of Congressional control, not advancement of user interests. Although numerous statements of Congressional "control" were, in fact, voiced,[19] plaintiffs' contention is rejected. For one thing, the Supreme Court has cautioned that the views of individual legislators should not be accorded significant weight in attempting to divine Congressional intent. *Weinberger v. Rossi*, 456 U.S. 25, 35 n. 15, 102 S.Ct. 1510, 1517 n. 15, 71 L.Ed.2d 715 (1982).[20] Moreover, contrary to plaintiffs' claim that the "entire legislative history" supports their position, Motion at 25, other statements indicating concern for nationwide users of National and Dulles were also made.[21] And, as noted above, the Act specifically states that the Board of Review is an "independent" body, and Congress may neither appoint nor remove its members. In view of these significant countervailing considerations, the statements of "control" simply do not suffice to demonstrate that the Board of Review is an "agent" or an "arm" of the Congress for separation of powers purposes.[22]

Even less persuasive is plaintiffs' position that the Board of Review is somehow "mandated" by the Airports Act. The Act does not establish any entity, federal or otherwise. Rather, it states that the airports are to be transferred "to a properly constituted independent airport authority created by the Commonwealth of Virginia and the District of Columbia," § 2452(a), authorizes the Secretary of Transportation to enter into a lease for National and Dulles, § 2454(a), and establishes certain conditions—including the makeup and powers of the Board of Review—that must be contained within the lease. §§ 2454 & 2456. Having being informed of these terms, Virginia and the District of Columbia freely agreed to enter into the lease with the federal government and passed legislation authorizing the establishment of the Airports Authority.[23] Those jurisdictions could have completely ignored the federal offer of a lease; but the fact that they accepted it does not mean that the Airports Act compelled them to do so. Indeed, had

18. Plaintiffs' baldly assert that the members of the Board of Review were "preselected," Reply at 6, but there is no support in the record for this claim.

19. *See* 132 Cong.Rec. H11,098 (daily ed. Oct. 15, 1986) (the bill "provides for congressional control over both airports") (statement of Rep. Coughlin); *id.* at H11,100 ("The beauty of the deal is that Congress retains its control without spending a dime"); *id.* at H11,105 (the bill "does not give up congressional control and oversight—that remains in a Congressional Board of Review") (statement of Rep. Conte).

20. Because the statements cited were made by supporters of the legislation in an eleventh-hour debate (the Airports Act was passed as part of an appropriations bill), it is not surprising that expressions of Congressional control might be emphasized to secure passage of the legislation.

21. Representative Hammerschmidt, later appointed to the Board of Review, stated that it was "created to protect the interests of users of the two airports." 132 Cong.Rec. H11,106 (daily ed. Oct. 15, 1986). A Representative from Maryland who supported the Act observed that the Board "has been established to make sure that the Nation's interest, the congressional interest was attended to in the consideration of how these airports are operated." *Id.* at H11,103 (statement of Rep. Hoyer). And in her testimony at hearings held on the legislation, Secretary Dole emphatically noted that "Members of Congress are heavy users of the air transportation system." *Proposed Transfer of Metropolitan Washington Airports: Hearings on H.R. 2337 Before the Subcomm. on Aviation of the House Comm. on Public Works and Transportation*, 99th Cong., 2d Sess. 110 (1986).

22. Plaintiffs also cite the three options for the Board of Review considered in August 1986 and argue that Congressional control is evident because two of those options would have created an oversight board appointed directly by Congress. *See* Pl.Ex. 3. But this contention proves too much. The Department of Justice rendered its opinion that these options were unconstitutional, *id.*, and Congress voted the third method (which the Justice Department had approved) for inclusion in the Act. If anything, that scenario demonstrates that Congress was sensitive to the constitutional ramifications of its actions.

23. Both state laws were passed almost one year *before* passage of the Airports Act, a fact that further undermines plaintiffs' assertion of Congressional influence.

the legislatures of Virginia and the District of Columbia *not* enacted their enabling statutes, the Airports Authority would not have existed and the federal lease of National and Dulles could not have occurred. The Board of Review derives its existence from state law, not federal law.

Stripped of its conceptual underpinnings, plaintiffs' constitutional attack collapses. The separation of powers doctrine is violated only by those provisions of law "that either accrete to a single branch powers more appropriately diffused among separate branches or undermine the authority and independence of one or another coordinate branch." *Mistretta*, 109 S.Ct. at 659–70. *See also Morrison v. Olson,* —— U.S. ——, 108 S.Ct. 2597, 2620, 101 L.Ed.2d 569 (1988). The Airports Act does neither. It does not improperly accrete any powers to Congress because Congress cannot force the Airports Authority to take any action and because the Board of Review possessing veto power is not under the Congress's control. Nor does the Act undermine the Executive Branch in any way, since the activities of the Board of Review are carried out by an independent, local Airports Authority created under state law.[24] In short, because Congress exercises no federal power under the Act, it cannot overstep its constitutionally-designated bounds.

In addition, the separation of powers doctrine applies horizontally among the federal branches of the federal government, not vertically between the federal and state governments. *See Chadha,* 462 U.S. at 951, 103 S.Ct. at 2784 (recognizing "[t]he hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power"); *Nixon v. Administrator of General Services,* 433 U.S. 425, 433, 97 S.Ct. 2777, 2785, 53 L.Ed.2d 867 (1977) (examining "the proper balance between the coordinate branches"); *Buckley,* 424 U.S. at 122, 96 S.Ct. at 684 (doctrine is

a "self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other").[25] But Congress took no action vis-a-vis the other branches in passing the Airports Act. Instead, it made an offer of a lease with certain conditions to Virginia and the District of Columbia, which accepted the offer and enacted legislation forming an interstate local entity to administer the Airports. This case is therefore unlike *Springer v. Government of the Philippine Islands,* 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928), where a territorial legislature removed voting power over stock in several national corporations from a coequal branch (the Governor–General) and placed it in a Board that included members of the legislature. Nor is this case like *Bowsher,* in which the Comptroller General, an official removable by Congress, was charged with the interpretation of federal law. 478 U.S. at 732–33, 106 S.Ct. at 3191. The Airports Act did not place any powers in the Congress at the expense of the Executive Branch, but rather offered them with conditions to Virginia and the District of Columbia. The separation of powers argument must fail.

■ The Court also concludes that the Airports Act infringes neither the Presentment Clause nor the bicameralism requirement. The Supreme Court in *Chadha* struck down a one-House veto of an immigration decision of the Attorney General because it amounted to "an exercise of legislative power"—defined as "action that had the purpose and effect of altering the legal rights, duties, and relations of persons"—that was had to be taken by both Houses and presented to the President. 462 U.S. at 962, 103 S.Ct. at 2789–90. No exercise of legislative power is present in the Airports Act. The statute authorizes a federal agency to lease certain property and states that the lease should contain

---

24. Although the airports were formerly administered by the Department of Transportation, it was the Department that created a commission to determine the best way to sever its relationship with the airports, approached the Congress with a proposal for transferring National and

Dulles, and obtained lease conditions to protect its interests.

25. Plaintiffs describe this proposition as an "overly crabbed theory," Reply at 8, but they suggest no authority to contravene the cases cited above.

certain conditions. Without the consent of Virginia and the District of Columbia, the lease would not have been executed and the Authority and the Board of Review would not exist. *Chadha* concerns do not arise in the instant case.

■■■ 2. The Court also rejects a trio of other constitutional claims asserted by plaintiffs. They first maintain that the Airports Act violates the Appointments Clause, Art. I, § 2, cl. 2, because the members of the Board of Review are "officers of the United States" who must be nominated by the President. The Appointments Clause is only implicated, however, when an individual "exercis[es] significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126, 96 S.Ct. at 685, and the Board of Review derives its power from an interstate compact whose members are not considered officers of the United States. *Seattle Master Builders Ass'n v. Pacific Northwest Elec. Power & Conservation Planning Council*, 786 F.2d 1359, 1365 (9th Cir.1986), *cert. denied*, 479 U.S. 1059, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987).[26] The Incompatibility and Ineligibility Clauses also do not apply. The former forbids a member of Congress from simultaneously "holding any Office under the United States," Art. I, § 6, cl. 2; the latter precludes a Congressman from being appointed to "any Office under the United States" if the office was created, or the emoluments increased, during his term as a Congressman. *Id.* But as noted above, the members of the Board of Review do not hold an "office of the United States" but serve on an interstate, local and independent Airports Authority.

## VI. Conclusion

In sum, the Board of Review is not an agent of Congress but owes its existence to an interstate compact between Virginia and the District of Columbia which signed a lease for the transfer of National and Dulles. The states are free to enter into such an interstate compact. The creation of the Authority and the Board of Review was not "mandated" by the Act, and this arm's-length transaction was entered into freely and willingly by all concerned. There is no question that Congress can dispose of federal property by lease and can attach conditions to its transfer, provided there is no constitutional bar to the transfer. *See South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987).[27]

There is no doubt that the Board of Review is a unique institution. Novelty is not equivalent to unconstitutionality, however. *Mistretta*, 109 S.Ct. at 661 ("Our constitutional principles of separated powers are not violated ... by mere anomaly or innovation"). In accordance with the Supreme Court's admonition that the separation of powers inquiry should be guided by "pragmatic, flexible approach," *Nixon*, 433 U.S. at 442, 97 S.Ct. at 2789–90, all aspects of the Airports Act and its history have been carefully examined. The Court concludes that the Act and the Board of Review that it authorizes do not violate the Constitution.

For these reasons, it is

ORDERED that plaintiffs' motion for summary judgment be and it hereby is denied; and it is

FURTHER ORDERED that defendants' motion for summary judgment be and it hereby is granted.

---

**26.** The Board of Review is authorized by the Authority's By–Laws and the lease with the federal government, and its powers are to be construed in accordance with Virginia law. Def. Ex. 3, art. 28. The Authority itself was, in turn, created by local legislation. State law, not federal law, governs its powers.

**27.** *South Dakota* held that the Secretary of Transportation could constitutionally withhold 5% of highway funds from any state that did not adopt a minimum drinking age of 21 years old. Here, Congress did not threaten to withhold anything if Virginia and the District did not create an Airports Authority. Nor was the offer of the airports so overwhelmingly irresistible that Virginia and the District of Columbia had no alternative but to accept—they agreed to make substantial payments to the United States Treasury in return for the lease. § 2454(b).