## CITIZENS FOR THE ABATEMENT OF AIRCRAFT NOISE, INC., et al., Appellants,

### v.

## METROPOLITAN WASHINGTON AIRPORTS AUTHORITY, et al., Attorney General, Intervenor.

### No. 89-7182.

United States Court of Appeals, District of Columbia Circuit.

Argued April 9, 1990.

Decided Oct. 26, 1990.

Patti A. Goldman, with whom Alan B. Morrison was on the brief, for appellants.

William T. Coleman, Jr., with whom Donald T. Bliss, Debra A. Valentine, and Nancy E. McFadden, were on the brief, for appellees.

Douglas Letter, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., and Jay B. Stephens, U.S. Atty., were on the brief, for intervenor.

Before WALD, Chief Judge, and MIKVA and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Dissenting opinion filed by Circuit Judge MIKVA.

BUCKLEY, Circuit Judge:

Citizens for the Abatement of Aircraft Noise challenge the constitutionality of certain conditions attached by Congress to the transfer of two federally owned and operated airports to a regional airport authority

created by the Commonwealth of Virginia and the District of Columbia. Specifically, they contest the legitimacy of the Board of Review, composed entirely of members of Congress, which the Authority was required to establish as a specific condition to the transfer of the airports. Because we find that the Board is effectively an agent of Congress and that its functions are executive in nature, we conclude that the Board is prohibited by the constitutional doctrine of the separation of powers from carrying out those functions.

## I. BACKGROUND

### A. Legislative Background

The Washington, D.C., metropolitan area is served by two major airports, Washington National and Washington Dulles International. These are owned by the Federal Government and were operated by it from the time they were opened (in 1941 and 1962, respectively) until March 1987, when they were leased to the newly formed Metropolitan Washington Airports Authority ("MWAA" or "Authority"). Their history of federal ownership and control is unique, as all other civilian airports in the country are operated by local, state, or regional authorities. Because of the importance of National and Dulles to the economic development of Northern Virginia and the District of Columbia, there have been several unsuccessful attempts over the years to transfer control of the airports to local authorities. In 1984, a commission under the chairmanship of former Virginia Governor A. Linwood Holton issued a report that provided the necessary catalyst for the relinquishment of federal control.

The Holton Commission recommended that the airports be turned over to an independent regional authority to be established by the Commonwealth of Virginia and the District of Columbia. To this end, the Virginia Assembly passed legislation authorizing the creation of the Metropolitan Washington Airports Authority. *See* 1985 Va. Acts ch. 598. The District of Columbia followed suit. *See* D.C.Law 6–67, 32 D.C.Reg. 6,093, 7,393 (1985). These acts empowered the Authority to acquire the airports by lease or otherwise, to issue bonds, carry out expansion plans, and perform other acts necessary to the task of administering the airports. Neither the Virginia nor the D.C. legislation provided for a special board with the power to veto the actions of the Authority and its governing board.

At about the same time, Congress also began work on legislation to implement the Holton Commission's recommendations and, on April 11, 1986, the Senate approved a bill that provided for a straightforward transfer of control over the airports to the Authority. 132 Cong.Rec. 7,263–81 (1986). Subsequently, in the course of the House Subcommittee on Aviation's consideration of the measure, its staff prepared drafts of three proposals for the establishment of a board composed of members of Congress that would have the power to review and disapprove actions taken by the new Authority.

Under the first proposal, Congress would create a "Federal Board of Review" having the power to veto Authority decisions. This board would consist of the Comptroller General plus three members appointed by the House and three by the Senate. The second proposal would require that the board be established by state law as a condition for the transfer of the airports to the Authority. Its congressional members, however, would continue to be appointed directly by their respective houses. Under the third proposal, the members would be selected by the Authority's Board of Directors from names submitted by the congressional leadership and would serve in their individual capacities as representatives of the airports' users.

In an advisory letter addressed to the Subcommittee Chairman, Assistant Attorney General John R. Bolton ("AAG") expressed the view that the first approach was clearly unconstitutional, as it sought to establish a committee of Congress vested with the authority to take legislative action—in the form of a veto—without meeting the Constitution's Bicameralism and Presentment requirements, namely, that legislative acts be approved by both houses

of Congress and presented to the President for his approval or veto. *See* Letter from Asst. Att'y Gen. J. Bolton to Rep. N. Mineta, at 1–2 (Aug. 6, 1986). Moreover, as at least some of the functions to be performed by the proposed board were "clearly operational" in nature, performance of them by members of Congress would violate the Constitution's Incompatibility and Appointments Clauses, which forbid officers of the United States from serving in Congress and require such officers to be appointed by the President. *Id.* at 2–3.

While the second proposal addressed some of these concerns by having the board created by state law rather than directly by Congress, the AAG concluded that this alternative was similarly flawed because Congress, through its agents, would still be exercising direct control over the operations of the airports. *Id.* at 5–7. The AAG, however, found the third proposal constitutionally acceptable, although not free from doubt. He reasoned that as the members would be representing their own interests as airport users, their membership on the board would not implicate separation-of-powers concerns. *Id.* at 7–8. Nevertheless, his letter suggested that efforts should be made to minimize the institutional role of Congress in the board's affairs, as the avoidance of constitutional difficulties turned on the board members' representing only their individual interests. *Id.* at 8.

This third proposal was adopted with minor modifications and was signed into law as the Metropolitan Washington Airports Act of 1986. 49 U.S.C.App. §§ 2451–2461 (Supp. V 1987) ("Airports Act"). The Airports Act authorized a long-term lease of National and Dulles Airports to the Authority created by Virginia and the District of Columbia. Under its terms, however, the Authority was required to establish a board of review composed entirely of members of Congress, with the power to veto certain actions of the Authority. 49 U.S.C. App. § 2456(f).

In response to this congressional action, Virginia and the District amended their respective statutes to empower the Authority to create such a board. 1987 Va. Acts ch. 665, § 1, Sec. 5(5); D.C.Law 7–18 § 3(c)(2), 34 D.C.Reg. 3,805, 5,249 (1987). These acts, however, did not require the Authority to establish a review board, nor did they specify what its composition or powers would be in the event the Authority decided to create one. By contrast, the Airports Act not only required the Authority to establish the present Board of Review as a condition for the lease of the airports, but described its composition and powers in great detail:

> The [Authority's] board of directors shall be subject to review of its actions … by a Board of Review of the Airports Authority. Such Board of Review shall be established by the board of directors and shall consist of the following, in their individual capacities, as representatives of users of the Metropolitan Washington Airports:
>
> (A) two members [from each of two named House committees] from a list provided by the Speaker of the House;
>
> (B) two members [from each of two named Senate committees] from a list provided by the President pro tempore of the Senate; and
>
> (C) one member chosen alternately from members of the House of Representatives and members of the Senate, from a list provided by the Speaker of the House or the President pro tempore of the Senate, respectively.

49 U.S.C.App. § 2456(f)(1).

The Act required that the Board be granted the power to disapprove the following decisions of the Authority:

(i) the adoption of an annual budget;

(ii) the authorization for the issuance of bonds;

(iii) the adoption, amendment, or repeal of a regulation;

(iv) the adoption or revision of a master plan, including any proposal for land acquisition; and

(v) the appointment of the chief executive officer.

*Id.* § 2456(f)(4). The Act then states that in the event the Board is

unable to carry out its functions under this subchapter by reason of a judicial order, the Airports Authority shall have no authority to perform any of the actions that are required by [subsection (f)(4)] to be submitted to the Board of Review.

*Id.* § 2456(h).

After the enactment of this legislation, the Secretary of Transportation entered into a lease with the Authority on March 2, 1987. Six months later its board of directors completed selection of the Board of Review from the lists submitted by the Speaker of the House of Representatives and the President pro tempore of the Senate. On March 13, 1988, the Authority adopted a Master Plan for the renovation of National and Dulles International Airports. On April 13, 1988, the Board of Review voted not to disapprove the Plan, which is now being implemented.

## B. Procedural Background

On November 16, 1988, Citizens for the Abatement of Aircraft Noise and two of its individual members (collectively, "Citizens") filed this lawsuit seeking declaratory and injunctive relief. They sought an order declaring that the Board of Review's disapproval authority was unconstitutional, and an order prohibiting the Board from taking any action under the Airports Act and barring the Authority from taking any action that would have to be submitted to the Board pursuant to the Act.

Citizens argued that the Board of Review was unconstitutional on several grounds. First, they claimed, on the basis of *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), that its veto power represents "an extra-constitutional check on the execution of the law." *Citizens for the Abatement of Aircraft Noise v. Metropolitan Washington Airports Authority,* 718 F.Supp. 974, 983 (D.D.C.1989) (internal quotes omitted). In *Chadha,* the Supreme Court struck down the provision in the Immigration and Nationality Act, 8 U.S.C. § 1254(c)(2), providing for the veto by either house of Congress of decisions of the Attorney General to allow particular de-

portable aliens to remain in the United States. The Court held that when Congress takes action that is legislative in character, it must meet the Bicameralism and Presentment requirements of the Constitution. *See* 462 U.S. at 951–59, 103 S.Ct. at 2784–88. Actions were deemed "legislative in character" if they affected the legal rights and responsibilities of persons outside the Legislative Branch. *See id.* at 952, 103 S.Ct. at 2784. Citizens argued that a Board veto, like the one-house veto, would be such a legislative act, and therefore, under *Chadha,* the Board could not constitutionally exercise such power in the absence of passage by both houses and presentation to the President.

Next, Citizens alleged that the functions of the Review Board are executive in nature, as they involve the operation of the airports. As such, the assumption of these powers by the members of Congress serving on the Board violated the doctrine of the separation of powers. 718 F.Supp. at 982. This doctrine, which is explained in *Bowsher v. Synar,* 478 U.S. 714, 726–27, 106 S.Ct. 3181, 3187–88, 92 L.Ed.2d 583 (1986), prohibits legislative officers from performing executive functions. Finally, according to Citizens, the executive nature of the Board's functions means that members of Congress cannot serve thereon without violating the Incompatibility and Ineligibility Clauses. U.S. Const. art. I, § 6, cl. 2.

The MWAA questioned the justiciability of Citizens' claims on several grounds. On the merits, it challenged the view that the members of the Board were in fact beholden to Congress. The MWAA stated that the Act made the Board a separate entity whose members, unlike the Comptroller General in *Bowsher,* were not removable by Congress and hence not subject to its control; that the Authority was statutorily independent of the Federal Government, 49 U.S.C.App. § 2456(b)(1); and further, that the members of the Board served "in their individual capacities, as representatives of users of the Metropolitan Washington Airports." *Id.* § 2456(f)(1). The MWAA also asserted that the authority being exercised

by the members was not, in any event, federal power: As the Authority and its creature, the Board of Review, were established in accordance with state law, no federal separation-of-powers question was raised.

The district court found that the claim was justiciable, but ruled for the defendants on the merits. 718 F.Supp. 974 (D.D. C.1989).

## II. Discussion

### A. Justiciability

■ As a threshold matter, we must consider whether this case is justiciable. Although the Authority has not pressed the issue on appeal, it is well established that a court of appeals must first satisfy itself of its own jurisdiction, *sua sponte* if necessary, before proceeding to the merits. *See Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 740, 96 S.Ct. 1202, 1204, 47 L.Ed.2d 435 (1976).

■ In the district court, the Authority argued that Citizens' claims were not ripe, that they had failed to exhaust their administrative remedies, and that they lacked standing to bring their constitutional claim. We agree with the district court that the first two issues warrant little discussion, and we find appellants' claims ripe and not precluded by the administrative exhaustion requirement substantially for the reasons given by the court.

We have little doubt, moreover, that appellants have alleged the distinct and palpable injury required to bring an action in federal court. To claim Article III standing, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Appellants' claim that they are adversely affected by noise, air pollution, and the risks of injury associated with flights in and out of National is not challenged. *See* 718 F.Supp. at 981. Furthermore, that harm is "fairly traceable" to the implementation of the Master Plan, which provides for a signifi-

cant increase in air traffic, because only with the Board of Review in operation can the Authority carry it out. *See id.* Lastly, it is obvious that a favorable ruling will redress Citizens' alleged injuries, because if the Board's actions are invalidated, then, under the provisions of the Act, the Authority will be unable to implement the Plan and continue expansion.

Having concluded that appellants have demonstrated Article III standing for the reasons stated above, we do not address the independent basis for standing found by the district court.

### B. The Merits

As an initial matter, we must address appellees' contention that separation-of-powers principles do not apply to the Board of Review in the first instance. They argue that as the Board does not exercise federal power and is not a federal entity, federal separation-of-powers principles are inapplicable. *See* Appellees' Brief at 34. Appellees imply, moreover, that even if those principles might otherwise apply, it is now accepted that Congress may use its powers under the Property Clause to create conditions on grants of federal property and thus "to achieve indirectly objectives that it is not empowered to achieve directly." *See id.* at 28. We turn first to these contentions.

1. *Applicability of Separation-of-Powers Principles*

 a. Nature of Power Exercised by Board of Review

Appellees' first argument for the non-applicability of separation-of-powers principles rests on the claim that the Board is not a federal entity and wields no federal powers. We will find that the Board wields federal power if we determine that it is "exercising significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126, 96 S.Ct. 612, 685, 46 L.Ed.2d 659 (1976). Although the Supreme Court enunciated this test in determining whether members of the Federal Election Commission were officers of the United States, we find the test equally ap-

plicable here, for the issue in both cases turns on whether the power wielded by a person or body has its source in federal authority.

The MWAA argues that because statutes of Virginia and the District of Columbia created the Authority and conferred on it the power to create the Board of Review, the latter is in fact a creature of state law. The Virginia and D.C. statutes, however, provide for none of the troublesome characteristics of the Review Board, such as a membership limited to members of Congress and the power to veto major actions of the Authority. Rather, it is the federal Airports Act that defines the Board's character. *See* 49 U.S.C.App. § 2456(f). The MWAA contends, nevertheless, that the Board of Review exercises no federal power because it derives its authority from the bylaws of an independent regional entity and participates in decisionmaking functions that are common to local airport authorities throughout the country. Appellees' Brief at 32.

 We find it irrelevant that the Board may be performing a function generally discharged by local authorities in other areas. The federal power includes the power to build, own, and operate airports. If the authority exercised by the Board over the operation of National and Dulles is derived from a federal source or exercised on behalf of the federal government, then separation-of-powers principles apply irrespective of the fact that the powers at issue are similar to those enjoyed by states or localities. Moreover, even though it is true, as the Authority asserts and the district court concluded, that Virginia and the District of Columbia could have walked away from the deal offered by Congress, their acceptance of the offer does not mean that the terms attached to it cannot result in an exercise of federal power. Nor is there any significance in the fact that the federal government was acting in a proprietary capacity when it required the Authority to create the Board as a condition to the lease of the airports. Whether Congress was legislating as sovereign or proprietor, any reservation of federal authori-

ty is subject to separation-of-powers constraints. *See Springer v. Government of the Philippine Islands*, 277 U.S. 189, 202–03, 48 S.Ct. 480, 482–83, 72 L.Ed. 845 (1928) (whether government deals with property in sovereign or proprietary capacity, it "nevertheless acts in its governmental capacity").

In order to secure the lease of the airports that are its sole reason for existence, the Authority had to create a board with the composition and authority dictated by the federal statute:

> The board of directors *shall* be subject to review of its actions and to requests, in accordance with this subsection, by a Board of Review of the Airports Authority. Such Board of Review *shall* be established by the board of directors and *shall* consist of the following....

49 U.S.C.App. § 2456(f)(1) (emphasis added). It is thus clear to us that, once the deal was accepted, it is federal law that resulted in the establishment of the Board of Review with its particular composition and authority. If there were any doubt about the matter, the provision in the statute disabling the Authority from performing many of its critical functions in the event the Board of Review is invalidated by judicial order makes plain that the law functions to maintain a federally mandated presence in the operation of the airports. *See* 49 U.S.C.App. § 2456(h).

In this light, it is wholly unrealistic to view the Board of Review as solely a creature of state law immune to separation-of-powers scrutiny. The district court itself noted the Supreme Court's caution that "separation-of-powers analysis does not turn on the labelling of an activity, but rather focuses on the unique aspects of the congressional plan at issue and its practical consequences." 718 F.Supp. at 983 (quoting *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 665, 102 L.Ed.2d 714 (1989)) (internal quotes and citations omitted). The court failed to see, however, that the "practical consequences" of the current arrangement are to maintain in place by federal law a body composed exclusively of

members of Congress that exercises operational control over the airports.

The district court thus begs the question when it concludes that separation-of-powers principles do not apply because Congress has not accreted powers to itself at the expense of the Executive, but rather has offered the airports to the Authority subject to conditions that the Authority, not Congress, has implemented. *See id.* at 986. As the Board exercises oversight responsibilities as a consequence of the Airports Act, separation-of-powers principles dictate that such oversight, like any exercise of federal power, be carried out in a manner consistent with the Federal Constitution.

b. Whether Board of Review Provision Is Legitimate as Valid Exercise of Congress's Property Clause Powers

■ In an argument based on the Supreme Court's decision in *South Dakota v. Dole,* 483 U.S. 203, 210–11, 107 S.Ct. 2793, 2797–99, 97 L.Ed.2d 171 (1987), the MWAA maintains that the Board, as constituted and empowered, is nevertheless legitimate because it was created in the course of Congress's lawful exercise of its extensive power under the Property Clause to dispose of federal property. Even if Congress could not constitutionally establish the Board directly, this argument runs, it has the power under the Property Clause to achieve the same result indirectly.

In *South Dakota,* the Court upheld a federal law directing the Secretary of Transportation to withhold five percent of otherwise allocable federal highway funds from States that did not have a minimum drinking age of at least twenty-one years. South Dakota had argued that the law violated the Twenty-first Amendment's reservation of power over intoxicating liquors to the States. The Court ruled that even assuming that Congress lacked the authority, in light of the amendment, to legislate a national minimum drinking age directly, nonetheless its powers to spend for the "general Welfare" were broad enough to sustain the conditions. *See id.* at 206–09, 107 S.Ct. at 2795–97. Noting that Con-gress's powers under the Property Clause, U.S. Const. art. IV, § 3, cl. 2, are as broad as those under the Spending Clause, *id.,* art. I, § 8, cl. 1, the Authority now suggests that Congress may circumvent the limitations on its authority imposed by the separation-of-powers doctrine by placing appropriate conditions on the transfer of government property. *See* Appellees' Brief at 27–28.

We believe the present case is distinguishable from *South Dakota.* It is well established that Congress may use its Spending Clause powers to advance policies that lie beyond the reach of its constitutional authority to legislate directly. *See United States v. Butler,* 297 U.S. 1, 66, 56 S.Ct. 312, 319, 80 L.Ed. 477 (1936). Thus, as the Court reasoned in *South Dakota,* the "independent constitutional bar" on direct congressional action is not "a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly." 483 U.S. at 210, 107 S.Ct. at 2798. Congress may make valid use of its Spending and Property Clause powers to achieve, through economic incentives, objectives that it might not be able to mandate directly. It does not follow, however, that Congress may use the same device to circumvent the functional constraints placed on it by the Constitution.

In the former case, the States help Congress achieve objectives beyond its immediate constitutional reach by agreeing themselves to legislate in areas where they constitutionally can legislate, but Congress cannot. They do this in exchange for an economic benefit provided by Congress in the exercise of its Spending (or Property) Clause powers. In the instant case, by contrast, Virginia and the District of Columbia cannot authorize Congress to exercise functions forbidden it by the Constitution. If federal power is wielded, then that power must be wielded in a constitutional manner. Thus, we conclude, *South Dakota* does not remove this case from separation-of-powers scrutiny.

2. *Application of Separation-of-Powers Principles to Board of Review*

■ Having concluded that separation-of-powers principles are applicable to this

case, we must now determine whether the Board of Review operates in conformity with them.

In support of their argument that the Board's structure violates the basic requirement that Congress not perform executive functions, appellants make two claims that appear at first inconsistent. First, they argue that the Airports Act gives to a group under the control of Congress an executive function, namely, the power to oversee the Authority's management of the airports. *See* Appellants' Brief at 30. Appellants argue, at the same time, that the Act violates the Bicameralism and Presentment requirements enunciated in *Chadha* because it grants the Board a veto power over the Authority. *See id.* These claims appear inconsistent because the first assumes that the Board is performing an executive function, in violation of *Bowsher,* while the second assumes that the Board, in exercising its veto powers, is performing a legislative function without benefit of Bicameralism and Presentment, in violation of *Chadha.*

In reality these positions are not logically inconsistent but rather two sides of the same theoretical coin, by which Congress must either stay clear of executive decisions once a legislative grant of authority has been made or intervene only with new, validly enacted law. *See Chadha,* 462 U.S. at 954–55, 103 S.Ct. at 2785–86 (once Congress confers power on the Executive, it must "abide by its delegation of authority until that delegation is legislatively altered or revoked"). Here, there is no claim that the actions of the Board of Review would satisfy the Bicameralism and Presentment requirements enunciated in *Chadha.* But because we find that the operation of the Board of Review partakes of an executive function, and that the Board is in essence a congressional agent, we invalidate it under the first of appellants' claims without expressing a view on the second.

*Bowsher,* we believe, is the relevant touchstone for what constitutes an executive function. In *Bowsher,* the Supreme Court focused on the fact that the Balanced Budget and Emergency Deficit Control Act of 1985 contemplated that the Comptroller General would exercise independent judgment and evaluations with respect to the execution of various budget-cutting measures. *See* 478 U.S. at 732–33, 106 S.Ct. at 3190–91. The Court determined, first, that "because Congress has retained removal authority over the Comptroller General, he may not be entrusted with executive powers." *Id.* at 732, 106 S.Ct. at 3191. It then found the authority vested in the Comptroller General to be unconstitutional because, although an agent of Congress, he was required to exercise responsibilities of an executive nature.

In this case, the Board is given disapproval powers over the adoption of an annual budget, the authorization of the issuance of bonds, the adoption, amendment, or repeal of any regulation, the adoption or revision of a master plan for airport expansion, as well as the appointment of the MWAA's chief executive officer. *See* 49 U.S.C.App. § 2456(f)(4)(B). This authority over key operational decisions is quintessentially executive.

We must now address whether the Board of Review is controlled by Congress, and again *Bowsher* will be our guide. The Authority argues, and the district court concluded, that although the Board was composed of members of Congress, it was nonetheless independent of Congress. *See* 718 F.Supp. at 984–85. In reaching that conclusion, the court cited the provision of the Airports Act which states that the members of the Board will act "in their individual capacities, as representatives of [the airports'] users," 49 U.S.C.App. § 2456(f)(1), and found, *inter alia,* that Congress did not have the power to remove members of the Board of Review because the Act was silent on the matter. *See id.* at 983–84.

We believe the court misjudged the extent to which members of the Board must, as a practical matter, be seen as representatives of Congress rather than of the airports' general users. Eight of the nine Board members are required by the Act to be members of the committees that have

direct jurisdiction over commercial aviation, and all of them are selected from lists submitted by the presiding officers of the two houses of Congress. These provisions reflect a direct congressional interest in the operational decisions of the Authority that the members of its Review Board, as sitting members of Congress, will find it difficult to ignore.

The district court dismissed these ties between the Board and Congress by pointing to precedents for appointments being made from similarly limited lists. *See* 718 F.Supp. at 984 & n. 16. Specifically, the district court noted that the Supreme Court "expressed no qualms" about the fact that the Comptroller General was appointed from a list of three individuals provided by the Speaker and the President pro tempore, citing *Bowsher*, and that the Judicial Conference of the United States submits the names of six judges for three appointments to the United States Sentencing Commission, citing *Mistretta*. *Id.* These comparisons are unpersuasive.

First, the district court erred in its reliance on *Mistretta*. The portion of that case cited by the court, *see id.*, dealt not with whether Congress had invaded the Executive's domain by reserving to itself excessive control over the selection and removal process, but rather with the distinct question of whether the Executive's appointment and removal authority over members of the Sentencing Commission threatened the independence of the Judiciary. *See* 109 S.Ct. at 673–74. Second, in neither of the examples cited by the district court did the names on the lists submitted consist of members of Congress. In the instant case, the lists contained . exactly that—the names of individuals who will continue to serve as full-time members of the Senate or the House of Representatives and, in the case of all but one of them, on committees directly concerned with the formulation of congressional policies affecting commercial aviation. Given these continuing institutional ties, we are unable to conclude that the members of the Board are truly independent and that they can realistically be expected to act as representatives of users other than those with whom they work on a daily basis on Capitol Hill.

Moreover, contrary to what the district court found, Congress does have the power to remove members of the Board. The Act specifically requires that the Board "shall consist of" members of specified committees of the House and Senate. As each house has the right to remove any of its members from any committee at any time, Congress has the power to disqualify any one or more of them from further service on the Board. It could be argued, of course, that Congress would be unlikely to discipline members of the Review Board by removing them from their qualifying committees. Nevertheless, as the Supreme Court noted in *Bowsher*, in response to the objection that Congress was unlikely to remove the Comptroller General,

> [t]he separated powers of our Government cannot be permitted to turn on judicial assessment of whether an officer exercising executive power is on good terms with Congress.... In constitutional terms, the removal powers over the Comptroller General's office dictate that he will be subservient to Congress.

478 U.S. at 730, 106 S.Ct. at 3190.

We thus conclude that the Board of Review as currently established violates the constitutional prohibition, articulated in *Bowsher*, against legislative agents performing executive functions. As we invalidate the Board on these grounds, we do not reach appellants' claims based on the Incompatibility and Ineligibility Clauses.

### III. Conclusion

We have determined that Citizens' claims are justiciable, and that the Board of Review, as currently constituted, unconstitutionally vests executive functions in an agent of Congress. The judgment of the district court is reversed and the case remanded with instructions to grant Citizens' request for declaratory and injunctive relief. We direct, however, that actions taken by the Board to this date not be invalidated automatically on the basis of our decision. *See Buckley v. Valeo*, 424 U.S. at 142, 96 S.Ct. at 693 (past acts of invalid-

ly constituted Commission accorded *"de facto* validity"*).

*It is so ordered.*

MIKVA, Circuit Judge, dissenting:

The court today strikes down an important governing authority and tells the U.S. Congress that it may not pass legislation permitting the federal government and the governments of Virginia and the District of Columbia to share responsibility for the operation of Washington's two major airports. Ignoring the time-honored canons that counsel restraint in constitutional interposition, the court destroys the carefully crafted plan for governance that Congress devised, creating an obstacle course to federalism that no Supreme Court precedent requires. I would affirm the district court's decision granting summary judgment in favor of the Metropolitan Washington Airports Authority (the "Authority"). *Citizens for the Abatement of Aircraft Noise, Inc. v. Metropolitan Washington Airports Authority,* 718 F.Supp. 974 (D.D.C.1989).

## I.

The majority's fundamental error is its failure to honor the cardinal rule of statutory interpretation that courts should construe statutes so as to avoid rather than implicate constitutional questions. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." (citation omitted)); *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 500, 99 S.Ct. 1313, 1318, 59 L.Ed.2d 533 (1979) (explaining that "an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available"). Indeed, such a rule of construction has long influenced this Circuit's jurisprudence. *See, e.g., Galliano v. U.S. Postal Service,*

836 F.2d 1362, 1369 (D.C.Cir.1988); *Hastings v. Judicial Conference of U.S.,* 829 F.2d 91, 101–02 (D.C.Cir.1987), *cert. denied,* 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988); *Loveday v. FCC,* 707 F.2d 1443, 1459 n. 24 (D.C.Cir.), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 525, 78 L.Ed.2d 709 (1983). As the Supreme Court has stated specifically with regard to separation of powers challenges: "When this Court is asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, ... it should only do so for the most compelling constitutional reasons." *Mistretta v. United States,* 488 U.S. 361, 384, 109 S.Ct. 647, 661, 102 L.Ed.2d 714 (1989) (quoting *Bowsher v. Synar,* 478 U.S. 714, 736, 106 S.Ct. 3181, 3193, 92 L.Ed.2d 583 (1986) (Stevens, J., concurring)). I find no such "compelling constitutional reasons" in this case to justify the majority's departure from the traditional rule of restraint.

## II.

Congress created neither the Authority nor its Board of Review (the "Board"). Both of those entities were created by the actions of Virginia and the District of Columbia. The court decides, however, that because the federal Airports Act (the "Act") describes the Board's composition and its power to veto certain Authority actions, the Board is a federal entity wielding federal powers, subject to separation of powers constraints. Although my primary disagreement with the court concerns its actual application of separation of powers principles to the facts of this case, I also question the court's characterization of the Board as a federal entity. It is certainly possible to view the Board as the district court did: The Airports Act authorizes the Secretary of Transportation to lease Dulles and National Airports to "a properly constituted independent airport authority created by the Commonwealth of Virginia and the District of Columbia," 49 U.S.C.App. §§ 2452(a), 2454(a) (1988), and establishes certain conditions concerning the Board of Review that must be contained within the

lease. 49 U.S.C.App. § 2456(f), (h). Both the Commonwealth of Virginia and the District of Columbia passed the requisite enabling legislation for the regional Authority, whose bylaws in turn establish the Board of Review and define its powers and composition. The fact that the federal Act authorizing the transfer of the airports to the Authority contemplates the Board's creation does not alter the Board's fundamental state parentage. If the Board derives its power from state law, then separation of powers principles—at least those that divide and allocate the sovereign power of the federal government among the three branches—would not constrain its actions.

### III.

Even assuming, however, that the Board of Review *is* a federal entity exercising federal power, I do not believe that it violates constitutional separation of powers principles. The court, adopting *Bowsher* as "the relevant touchstone," finds the Board unconstitutional because it exercises "quintessentially executive" functions while under the control of Congress. Maj.Op. at 56. The court's conclusion that the Board is controlled by Congress rests on: (1) its concern about the appointment of legislators to the Board from lists provided by congressional leaders; and, most importantly, (2) Congress' alleged possession of removal power. I examine each concern in turn.

### A. *The Appointment Process*

Under Article IV, Section 1 of the Authority's bylaws and Section 2456(f)(1) of the Act, the Authority's board of directors is empowered to establish a nine-member Board of Review composed of two members each from the House Appropriations Committee, the House Public Works and Transportation Committee, the Senate Appropriations Committee, and the Senate Commerce, Science and Transportation Committee, as well as one additional member of the House or Senate. The board of directors appoints the members from lists provided by the Speaker of the House and the President *pro tempore* of the Senate. The Board of Review members serve in their "individual capacities, as representatives of [the airports'] users." 49 U.S.C. App. § 2456(f)(1); Bylaw Article IV, Section 1.

The mere fact that congressional leaders submit lists of proposed Board candidates to the Authority does not, as the district court noted, raise constitutional concerns. *See Citizens for the Abatement of Aircraft Noise*, 718 F.Supp. at 984 & n. 16. The Supreme Court has previously confronted such limited lists without suggesting that they violate separation of powers principles. *See Bowsher*, 478 U.S. at 727, 106 S.Ct. at 3188 (President nominates Comptroller General from list of three individuals recommended by Speaker of the House and President *pro tempore* of the Senate); *Mistretta*, 488 U.S. at 368, 410 n. 31, 109 S.Ct. at 652, 674 n. 31 (Judicial Conference submits list of six judges, from which President appoints at least three to the Sentencing Commission).

Instead, what troubles the majority is the Board's composition. The court essentially holds that, because Board members also serve on congressional committees "directly concerned with the formulation of ... policies affecting commercial aviation," their decisions with respect to the Authority will be dictated by congressional goals and interests. *See* Maj.Op. at 56–57. I disagree with the court's assertion that members of congressional transportation and appropriations committees may not constitutionally serve in their individual capacities as representatives of airport users. In *Mistretta*, the Supreme Court found no absolute constitutional prohibition against federal judges serving as members of the United States Sentencing Commission, a body alleged to exercise legislative authority through its promulgation of sentencing guidelines. *See* 488 U.S. at 383–84, 404, 109 S.Ct. at 660–61, 671. The Court's analysis of the judges' dual responsibilities is particularly illuminating:

> The judges serve on the Sentencing Commission not pursuant to their status and authority as Article III judges, but solely

because of their appointment by the President as the Act directs. Such power as these judges wield as Commissioners is not judicial power; it is administrative power derived from the enabling legislation.... [T]he judges, uniquely qualified on the subject of sentencing, assume a wholly administrative role upon entering into the deliberations of the Commission.

*Mistretta,* 488 U.S. at 404, 109 S.Ct. at 671. The Court's reasoning in *Mistretta* is directly applicable here to the Board of Review: members of Congress, particularly qualified on the subjects of commercial aviation and institutional operations, serve in an individual administrative—not legislative—capacity when they review the Authority's actions.

It is gratuitous to assume that committee membership automatically leads to congressional control. We should not presume that Board members will tailor their decision-making to congressional desires when there is no statutory requirement that Board members consult with any committee of Congress, or that the Board's actions be subject to any kind of congressional oversight. The Board of Review's appointment process simply violates no constitutional separation of powers principles heretofore articulated.

B. *Removal Power*

As the court itself recognizes, locating removal power is central to separation of powers analysis. *See Bowsher,* 478 U.S. at 727, 106 S.Ct. at 3188 ("The critical factor [in determining that the Comptroller General is subservient to Congress] lies in the provisions of the statute ... relating to removability."); Maj.Op. at 57. In *Bowsher,* a federal statute provided that the Comptroller General could be removed for a variety of causes, but only through congressional impeachment or resolution. Here, by contrast, the federal Act and the Authority's bylaws are silent as to removal procedures for Board of Review members. Despite the absence of a factual predicate, the court nevertheless analogizes this case to *Bowsher.* It notes that the Board is composed of members of specified congres-

sional committees, and concludes that Congress effectively exercises removal power over the Board through its ability to "remove any of its members from any committee at any time." Maj.Op. at 57. I believe that this interpretation is seriously flawed.

First, the court relies heavily on language from *Bowsher* stating that constitutionality cannot turn on judicial assessments of whether an officer "is on good terms with Congress"; the court also quotes *Bowsher's* conclusion that "the removal powers over the Comptroller General's office dictate that he will be subservient to Congress." Maj.Op. at 57 (quoting *Bowsher,* 478 U.S. at 730, 106 S.Ct. at 3190). The clear import of the court's quotation is that the Board members stand in the same "subservient" relationship to Congress as the Comptroller General in *Bowsher.* As noted above, however, the relevant statutory schemes are strikingly different: whereas Congress was authorized to remove the Comptroller General by a variety of methods and for a variety of causes, the Airports Act vests no removal power in Congress whatsoever. In the quoted excerpt from *Bowsher,* Chief Justice Burger was simply responding to the dissent's argument that Congress was unlikely ever to *exercise* its (clearly possessed) removal power; he did not have before him a situation, like this, where the very locus of the removal power was a matter of dispute. Thus, the court's citation of *Bowsher* is both misleading and analytically unsound.

Second, I disagree with the court's analysis of the removal power. As the district court noted, well-established rules of statutory construction suggest that, " 'absent a specific provision to the contrary, the power of removal from office is incident to the power of appointment.' " *Citizens for the Abatement of Aircraft Noise,* 718 F.Supp. at 984 & n. 14 (quoting *Carlucci v. Doe,* 488 U.S. 93, 99, 109 S.Ct. 407, 672, 102 L.Ed.2d 395 (1988) (internal quotation omitted)). Under this interpretation, the Authority's board of directors—not Congress—would possess removal power over the Board of Review. *See also* Metropoli-

tan Washington Airports Authority Resolutions Nos. 87–12, 87–27 (establishing that "the Board of Directors may remove for cause an appointee to the Board of Review prior to the conclusion of his term").

Third, the court's interpretation is unpersuasive even on its own terms. The statute provides only that the Board of Review shall "consist" of members of the specified congressional committees. 49 U.S.C.App. § 2456(f)(1). In light of the *Ashwander* principle, cited above, that courts should construe statutes to avoid constitutional infirmities where possible, we should not read the Act to prohibit a Board member who serves on the appropriate committee at the time of her appointment and later leaves the committee—or even loses a bid for reelection—from serving out her full Board term. The fact that the standard term of service on the Board of Review is six years, *see* 49 U.S.C.App. § 2456(f)(2), thus spanning three Congresses, further supports the notion that a Board member's tenure need not correlate with his or her congressional status.

### IV.

I would affirm the district court's grant of summary judgment for the Authority. Unlike the panel, I find no constitutional infirmities in the appointment process for Board members: *Bowsher* and *Mistretta* addressed similar procedures without invalidating them, and the mere fact that members of Congress serve on the Board in their individual capacities does not present a constitutionally adequate distinction. Nor do I find any problems with removal power over Board members: the statutory silence in this case is very different from the explicit authority possessed by Congress in *Bowsher*, and plausible alternative constructions exist under which removal power rests with the Authority's board of directors. The declaratory and injunctive relief the court today orders—preventing the Authority from taking any actions (such as bond issuances, or adoption of a budget or master plan) for which Board of Review approval is statutorily required—thwarts local control over and planning for the airports. I see no reason for this court to reach the drastic result of invalidating a delicately-balanced and innovative institution of federalism on separation of powers grounds when plausible—indeed more plausible—alternative interpretations would sustain the Board of Review as constitutional.