[No. 42306-1-I. Division One. November 15, 1999.]

THE CITY OF DES MOINES, ET AL., *Appellants*, v. THE PUGET SOUND REGIONAL COUNCIL, ET AL., *Respondents*.

*Peter J. Kirsch*; *John William Hempelmann* of *Cairncross & Hempelmann, P.S.*; *Gary Neil McLean, Des Moines City Attorney* (*Thomas D. Roth* and *Perry M. Rosen* of *Cutler & Stanfield L.L.P.*, of counsel); *Michael R. Kenyon* and *Robert Franklin Noe* of *Kenyon Law Firm*; *Londi K. Lindell, Federal Way City Attorney*; *Wilton S. Viall III*; and *David Todd Hokit* of *Curran Mendoza, P.S.*, for appellants.

*John Tayloe Washburn* and *Roger A. Pearce* of *Foster Pepper & Shefelman P.L.L.C.*; *David Alan Bricklin* and *Jennifer A. Dold* of *Bricklin & Gendler*; *Rodney L. Brown, Jr.*; *Stephen Thaxton Parkinson*; *Linda J.N. Strout*; and *Traci Marie Goodwin*, for respondents.

AGID, J. — In July 1996, the Puget Sound Regional Council (PSRC) enacted Resolution A-96-02, which amended the central Puget Sound's Regional Transportation Plan (RTP) to include planning for a third runway at Seattle-Tacoma International Airport. Several cities adjacent to the proposed expansion site,[1] along with Highline School District No. 401 and the Airport Communities Coalition (Cities), challenged the PSRC's decision to amend the RTP in the King County Superior Court. The trial court dismissed the Cities' claims and upheld the PSRC's decision, and the Cities appealed only one issue: the court's conclusion that the Growth Management Act (GMA) does not require regional transportation plans to comply with local comprehensive plans. The Cities contend that by failing to take "any meaningful measures to ensure that the project is not in conflict with the existing comprehensive plans of the surrounding, impacted communities," the

[1]Des Moines, Burien, Federal Way, Normandy Park, and Tukwila.

PSRC violated RCW 47.80.023(2) of the GMA,[2] which directs that regional transportation plans are to be "consistent with county-wide planning policies . . . county, city, and town comprehensive plans, and state transportation plans."

The PSRC and the Port respond that there is no inconsistency between the amended regional plan and the local plans, and that the PSRC, a planning agency, has no duty to include specific mitigation measures in its planning documents. In addition, they contend that if there were a conflict between regional and local plans after the regional and local planners engaged in the coordinated planning process required by the GMA, the Legislature intended that the regional plan should prevail. We agree.

## FACTS

The PSRC, the transportation planning entity for the Central Puget Sound area, was created in 1991 by the King, Kitsap, Snohomish, and Pierce county governments and the majority of the cities and towns within these counties.[3] These counties and cities participate as voting members of the PSRC, whose mission is to adopt and maintain regional transportation and growth management standards for the Central Puget Sound area. To meet its transportation-planning obligations, the PSRC prepares the RTP.[4] And to guide its regional growth management strategy, the PSRC has adopted a document called VISION 2020, which was prepared in 1990 by PSRC's predecessor, the Puget Sound Council of Governments.

In 1988, a regional airport planning task force, the Puget Sound Air Transportation Committee (PSATC), was created to develop alternatives and recommendations for meeting the region's long-term air carrier needs. It issued the

---

[2]Although the bulk of the GMA is codified in RCW 36.70A, RCW 47.80 contains the transportation elements of the Act. The Legislature adopted both chapters as part of a single legislative bill.

[3]*See* RCW 47.80.020.

[4]PSRC is required to adopt a transportation plan under federal law as well. *See* 23 U.S.C. § 134. The RTP satisfies both the state and federal obligations.

1988 Regional Air System Plan (RASP), which described the existing regional airport system and addressed strategies to meet future air carrier demand. This report was included in VISION 2020. In 1992, PSATC issued a Flight Plan Project Report, which recommended a multiple airport system and a third runway at Sea-Tac Airport. In conjunction with this report, the PSRC and the Port issued an environmental impact statement (EIS), called the Flight Plan EIS, which identified the range of proposed alternatives and their potential environmental impacts on the region.

In 1993, following review of the Flight Plan Project Report and EIS, along with several meetings and hearings, PSRC's General Assembly adopted Resolution A-93-03, which amended the air transportation element of VISION 2020 to recommend that "the region should pursue vigorously, as the preferred alternative, a major supplemental airport and a third runway at Sea-Tac." Under this Resolution, the PSRC would not approve the construction of a new runway unless an environmental, financial and market feasibility study showed that a supplemental airport site could not eliminate the need for an additional runway. To satisfy its requirement that there be planning and feasibility studies, the PSRC established expert panels to determine whether supplemental sites were feasible, to review demand/system management programs, and to analyze noise reduction measures that were in place at Sea-Tac.

Shortly thereafter, the Executive Board concluded in Resolution EB-94-01 that "there are no feasible sites for a major supplemental airport within the four-county region and that continued examination of any local sites will prolong community anxiety while eroding the credibility of regional governance . . . ." This Resolution provided that the third runway would be authorized provided that "the project meets the independent evaluation of the noise and demand management conditions set out in Resolution A-93-03, and satisfies the environmental impact review process." After two years of review, an Expert Arbitration Panel issued a

final order concluding that increased management would not eliminate the need for a third runway and that despite a good faith effort, Sea-Tac had not satisfied the noise condition in Resolution A-93-03.

In April 1996, the PSRC decided to amend the existing RTP to plan for a third runway at Sea-Tac and to require additional noise reduction measures at the existing airport. During May and June of 1996, the PSRC conducted a State Environmental Policy Act (SEPA) review of this proposal that consisted primarily of the analysis in the previously-issued Flight Plan EIS along with an addendum that provided additional information and analysis.

On June 27, 1996, the Executive Board voted to recommend approval of the RTP amendment to the PSRC General Assembly, and on July 11, 1996, the General Assembly voted to adopt Resolution A-96-02 by an 84 percent majority. The plaintiff Cities voted against the amendment. They point out that the new runway would require construction of a new land mass level with the plateau on which the existing airport stands. This construction would require transporting more than 26 million cubic yards of dirt which would be excavated from mining pits located throughout the Central Puget Sound region and transported via double-trailer dump trucks through the cities surrounding the airport.[5]

The Cities challenged the PSRC's decision in King County Superior Court, alleging violations of the GMA and SEPA, along with breach of contract, breach of agreement to arbitrate, and promissory estoppel. After reviewing the statutory language of RCW 47.80.023 and the GMA in its entirety, the trial court issued a final order with a separate memorandum ruling on the application of RCW 47.80.023(2), which concluded that "[t]here is simply no persuasive argument supporting plaintiffs' argument that

---

[5]The Cities predict that "[t]rucks carrying dirt would . . . become ubiquitous in the communities around the Airport, at a rate of 3,488 trips per day and nearly one million trips per year during the course of construction."

cities have a statutory right to trump regional actions." The Cities appeal this legal conclusion.

## DISCUSSION

██ The Cities obtained a constitutional writ of review under article IV, section 6 of the Washington State Constitution to challenge the PSRC's amendment to Resolution A-96-02.[6] On appeal from a trial court decision on writ of review, appellate courts engage in a de novo review of the agency's record, not the trial court's judgment,[7] to determine whether the action of a local legislative body was either illegal or arbitrary and capricious, depending on the issue presented.[8] Because this appeal presents only a "fundamental legal question" concerning the obligations imposed by RCW 47.80.023, we must determine whether the PSRC's actions violated that provision of the GMA.

The trial court correctly noted that "[r]eview by a constitutional writ is limited to the Court's review of the record before the agency to determine whether the decision or act complained of involved arbitrary and capricious or illegal actions violating the appellants' fundamental right to be free of such actions."[9] The Cities imply that the trial court focused exclusively on whether the PSRC's decision was arbitrary and capricious and urge this court to apply the "correct" clear error of law standard. This argument ignores the fact that the trial court devoted a seven-page memorandum to that issue. In its Memorandum Ruling on the Application of RCW 47.80.023(2), the court noted that

---

[6]Washington recognizes three methods of judicial review of administrative decisions: (1) direct appeal as authorized by a statute or ordinance, (2) statutory writ of review under RCW 7.16.040 (also known as statutory certiorari), and (3) discretionary review pursuant to the court's inherent constitutional power (also known as constitutional or common law certiorari). *Kreager v. Washington State Univ.*, 76 Wn. App. 661, 664, 886 P.2d 1136 (1994).

[7]*Buechel v. State Dep't of Ecology*, 125 Wn.2d 196, 203, 884 P.2d 910 (1994).

[8]*Responsible Urban Growth Group v. City of Kent*, 123 Wn.2d 376, 383, 868 P.2d 861 (1994).

[9]The standard is articulated in *Bridle Trails Community Club v. City of Bellevue*, 45 Wn. App. 248, 251-52, 724 P.2d 1110 (1986).

although it had previously determined that the PSRC's decision to amend the RTP was not arbitrary and capricious, it must also analyze the legal requirements of RCW 47.80.023(2) to determine whether the PSRC's action violated that provision. It concluded that it did not. We must undertake the same analysis of the PSRC's decision and the GMA's requirements to determine whether the trial court correctly concluded that the PSRC's amendment did not violate the GMA.

## 1. The Question of Inconsistency

Resolution A-96-02 amended the RTP to authorize "[p]lanning for a third runway for Sea-Tac Airport . . . provided the project satisfies the Federal Aviation Administration and Port of Seattle environmental impact review and permit processes and is authorized by the Port of Seattle and agencies with permitting authority." The Cities claim that this amendment is inconsistent with their local plans because the plans call for mitigation of the runway's adverse effects, and the Resolution does not mention specific mitigation measures.

As an initial matter, the Port and the PSRC argue that the PSRC's failure to include specific mitigation measures in its RTP amendment does not mean that the plan is inconsistent with the Cities' comprehensive plans, which do not require the PSRC itself to impose these measures. The trial court reserved ruling on this question, choosing instead to address the legal requirements of RCW 47.80-.023(2):

> For the purposes of this ruling, the Court simply assumes that the mitigation requirements of local comprehensive plans, as they are interpreted by plaintiffs, do conflict with Resolution A-96-02. The Court in this ruling then addresses only the question of what impact if any RCW 47.80.[0]23(2) has on such a conflict.

The trial court recognized, however, that because none of the local policies require the PSRC to impose mitigation, the local policies are "not necessarily inconsistent with

Resolution A-96-02, which itself calls for mitigation."
Indeed, the Cities have failed to point to even one provision
that could be interpreted as imposing a specific mitigation
responsibility on the PSRC.[10] Thus, our review of the poli-
cies leads us to believe that there is no actual conflict be-
tween the amended RTP and the local plans. But because
this issue was not developed below, we will follow the trial
court's lead and focus our analysis on the legal question of
whether the GMA requires regional plans to be consistent
with previously adopted city plans.

2. The PSRC's Role

 In the opening section of their brief, the Cities
"crystallize" the issue presented in this case: "[W]hich
entities are required by the GMA to ensure that the un-
precedented Sea-Tac Airport expansion is built in a way
that minimizes conflicts with the land use plans of the sur-
rounding communities?" The Port argues that the PSRC is
not required to minimize construction impacts because its
role is "to establish planning direction for regionally signif-
icant planning transportation projects, not to conduct
detailed review and approvals of project-level actions." The
Interlocal Agreement which established the PSRC supports
this assertion. It identified the PSRC's mission to prepare,
adopt, and maintain goals, policies, and standards for
regional transportation and regional growth management
in the Central Puget Sound area. Accordingly, the trial
court found that "PSRC is a planning agency . . . not a
permitting agency," and concluded that:

> The PSRC only has authority to adopt planning policies in
> various forms. As a planning agency, it does not adopt or imple-
> ment development regulations. PSRC does not issue permits
> for specific projects and therefore does not generally impose
> mitigation requirements for individual projects. Imposing mit-

---

[10]For example, a representative provision of the Des Moines policy seeks to
"minimize the adverse impacts on constructing new transportation facilities."
Even those polices which mention other agencies include only the Port and the
Federal Aviation Administration. They do not contain any references to the PSRC
or mitigation the Cities expect from that body.

igation is the responsibility of agencies with permitting authority.

The trial court correctly characterized the PSRC's role in the GMA scheme. Because the Resolution is a planning document created by a planning agency, it need not specify at this juncture which project-specific mitigation measures are to be undertaken.

In their reply brief, the Cities contend that they "have never argued that the PSRC has the authority to 'regulate' or 'permit' specific project implementation." Rather, the Cities assert that the "PSRC's authority to determine which projects are appropriate to include in a regional transportation plan includes the power to exclude or place conditions on projects to assure their consistency with local comprehensive plans." We agree that the PSRC has "the power" to place mitigating conditions on planning decisions. We hold, however, that it does not have a *duty* to impose such conditions at the planning stage.

The fact that the PSRC is not required in its planning documents to impose site-specific mitigation measures does not mean that mitigation will not be imposed. At oral argument, the PSRC provided this court with an overview of the federal, state, regional, county, and local regulations and conditions that will be placed on the construction. The Federal Aviation Administration (FAA), Environmental Protection Agency, Department of Natural Resources, Port of Seattle, City of Sea-Tac, and other cities surrounding the expansion will assume an active role in imposing mitigation requirements and permitting conditions. The FAA, in particular, may approve a project only if it finds that "no possible and prudent alternative to the project exists and that every reasonable step has been taken to minimize the adverse effect."[11] The Cities' dire prediction that mitigation will never be undertaken because it has not been specifically imposed by the PSRC's authorization for further planning is unfounded.

[11] 49 U.S.C. § 47106(c)(1)(C).

### 3. Regional Primacy in the GMA

■ In addition to the fact that the PSRC is a planning body with no duty to condition its authorizations for project planning, the GMA itself provides an alternative basis for our holding that the PSRC is not required to alter its planning documents to comply with ostensibly conflicting provisions in local plans. Although the Legislature did not explicitly direct that regional plans should prevail over local plans if the two conflict, when construed as a whole, the GMA evinces the Legislature's intent to discard the traditional land use system in which each jurisdiction functioned as an isolated entity in favor of a scheme which stresses coordination, cooperation, and integration. In light of this legislative purpose, we agree with the PSRC that if the coordinated planning process does not result in consistency between regional and local plans, the regional plans must prevail.

■ The Cities base their argument that the PSRC must "take some meaningful action to achieve consistency with local plans"[12] on "the express wording of RCW 47.80.023," which requires the PSRC to "[p]repare and periodically update a transportation strategy for the region" that is "consistent with . . . county, city, and town comprehensive plans, and state transportation plans." They claim that because this directive is so clear, "a detailed analysis of other GMA provisions is not warranted in order to ascertain the meaning of RCW 47.80.023(2)."[13] To support this argument, the Cities cite several cases which direct that "a statute which is clear on its face is not subject to judicial interpretation."[14] Contrary to the Cities' characterization, these cases do not stand for the proposition that one provision of a statute should be considered without regard to other provisions included under the same subheading. Thus, we must first construe RCW 47.80 as a whole to

---

[12](Emphasis omitted.)

[13](Emphasis omitted.)

[14]*Marquis v. City of Spokane*, 130 Wn.2d 97, 107, 922 P.2d 43 (1996).

determine whether it is susceptible to only one interpretation.[15]

RCW 47.80.010 declares that the transportation system in Washington "should function as one interconnected and coordinated system" and "should be coordinated with local comprehensive plans." To that end, the Legislature established in subsections (1) through (4) of RCW 47.80.023 regional transportation organizations and delineated their duties:[16]

(1) Prepare and periodically update a transportation strategy for the region. The strategy shall address alternative transportation modes and transportation demand management measures in regional corridors and shall recommend preferred transportation policies to implement adopted growth strategies. The strategy shall serve as a guide in preparation of the regional transportation plan.

(2) Prepare a regional transportation plan as set forth in RCW 47.80.030 that is consistent with county-wide planning policies if such have been adopted pursuant to chapter 36.70A RCW, with county, city, and town comprehensive plans, and state transportation plans.

(3) Certify by December 31, 1996, that the transportation elements of comprehensive plans adopted by counties, cities, and towns within the region reflect the guidelines and principles developed pursuant to RCW 47.80.026, are consistent with the adopted regional transportation plan, and, where appropriate, conform with the requirements of RCW 36.70A-.070.

(4) Where appropriate, certify that county-wide planning policies adopted under RCW 36.70A.210 and the adopted regional transportation plan are consistent.

---

[15]A statute is ambiguous if it is susceptible of two or more reasonable interpretations. *State v. Van Woerden*, 93 Wn. App. 110, 116, 967 P.2d 14 (1998), *review denied*, 137 Wn.2d 1039 (1999). Courts do not construe unambiguous statutes: "In judicial interpretation of statutes, the first rule is 'the court should assume that the legislature means exactly what it says. Plain words do not require construction.' " *State v. McCraw*, 127 Wn.2d 281, 288, 898 P.2d 838 (1995) (quoting *City of Snohomish v. Joslin*, 9 Wn. App. 495, 498, 513 P.2d 293 (1973)).

[16]RCW 47.80.023.

The Cities argue that RCW 47.80.023(2) is unambiguous and that it "states simply and directly that PSRC must ensure that its RTP is consistent with the comprehensive plans of surrounding cities." The PSRC and the Port counter that because the statute "requires two-way consistency," without indicating "which plan takes priority if an inconsistency exists," subsections (2) and (3) are susceptible to two different interpretations and require resort to rules of statutory construction. We agree that consideration of RCW 47.80.023(2) together with RCW 47.80.023(3) reveals that the Legislature has directed that regional plans are to be consistent with local plans *and* that the transportation elements of local plans are to be consistent with regional plans.

The Cities argue that these subsections are not inconsistent because subsection (3) refers only to the *transportation* elements of local plans. But because RCW 36.70A.070 requires all comprehensive plans to be internally consistent, the Cities cannot argue that their land use elements can negate regional transportation plans as long as their transportation elements are consistent. The Legislature likely referred specifically to "transportation elements" in RCW 47.80.023(3) because the statute's subject matter is transportation. The trial court correctly reasoned that subsection (3) "counter-balances any inference of subsection (2) that the regional planning is uniquely required to defer to cities or to any other specific jurisdiction."

■ Because RCW 47.80.023 requires consistency from both regional and local plans without specifying which prevails, and no other GMA section explicitly addresses this issue, we are faced with a gap in the statutory scheme. In these situations we attempt to discern the intent of the Legislature as evidenced by the statute's structure and history of its enactment.[17] Here, we must consider both RCW 36.70A and RCW 47.80 because they were adopted as part of a single legislative bill, then codified separately.

[17]*Washington State Human Rights Comm'n ex rel. Spangenberg v. Cheney Sch. Dist. 30*, 97 Wn.2d 118, 121, 641 P.2d 163 (1982). But if it is impossible to determine what the Legislature intended, it is up to the Legislature, and not the

RCW 36.70A.010, the introductory provision of the GMA, expresses a concern that "uncoordinated and unplanned growth, together with a lack of common goals," poses a threat to the viability and sustainability of this region. This threat stemmed from traditional zoning practices which focused narrowly on whether given uses and improvements of sites would be compatible with their immediate surroundings and largely ignored the more wide-ranging impacts of their decisions. With the GMA, Washington instituted a cooperative, coordinated approach to land management through a "bottom-up"[18] system of growth management, "with the central locus of decision-making at the local level . . . ."[19] This approach was intended to ensure that "citizens, communities, local governments, and the private sector cooperate and coordinate with one another in comprehensive land use planning."

In RCW 36.70A.210, the Legislature indicated that coordination should occur through planning at the county level when it directed that countywide planning policies should serve as the "framework from which county and city comprehensive plans are developed and adopted pursuant to this chapter." The King County Countywide Planning Policy (CPP), which was ratified by the Cities in 1994, provides that "all jurisdictions in the County . . . shall develop a balanced transportation system & and land use plan which implement regional mobility and reinforce the Countywide vision." The CPP further directs that "King

courts, to fill in the gap. "Courts may not read into statutes that which is not there." *St. Francis Extended Health Care v. Department of Soc. & Health Servs.*, 115 Wn.2d 690, 704, 801 P.2d 212 (1990).

[18]Oregon, in contrast, has developed a "top-down" system, in which state authority assumes primacy over local planning. *See* Hong N. Huynh, *Administrative Forces in Oregon's Land Use Planning and Washington's Growth Management*, 12 J. ENVTL. L. & LITIG. 115 (1997).

[19]Richard L. Settle & Charles G. Gavigan, *The Growth Management Revolution in Washington: Past, Present, and Future*, 16 U. PUGET SOUND L. REV. 867, 897 (1993). *See also* Eric S. Laschever, *An Overview of Washington's Growth Management Act*, 7 PAC. RIM L. & POL'Y J. 657, 662 (1998) ("The principal mechanism for implementing the Act's growth management goals is planning at the local level, by cities and counties.").

County, its cities, [and] adjacent counties . . . shall support the continuous, comprehensive and cooperative transportation planning process conducted by the Puget Sound Regional Council pursuant to its Metropolitan Planning Organization designation." This provision makes clear that the PSRC is intended to be "[t]he primary forum for the development of regional transportation systems plans and strategies . . . ." Thus, the GMA vests authority in the PSRC, which is composed of and controlled by the counties and cities within the central Puget Sound region, to oversee important regional decisions and coordinate the planning process.

RCW 47.80, entitled "Regional Transportation Planning Organizations," provides further support for the conclusion that regional and countywide planning must control land use decisions in Washington. In this section, the Legislature applied the "bottom-up" approach to transportation and declared that it is "in the state's interest to establish a coordinated planning program for regional transportation systems and facilities throughout the state." RCW 47.80.010. The first substantive subsection of RCW 47.80 authorizes regional transportation planning organizations to be formed "through the voluntary association of local governments within a county, or within geographically contiguous counties." RCW 47.80.020. In addition, RCW 47.80.030 provides that "[a]ll transportation projects, programs, and transportation demand management measures within the region that have an impact upon regional facilities or services must be consistent with the plan and with the adopted regional growth and transportation strategies." It is difficult to imagine how the Legislature could have made more clear its intent that both transportation and land use planning should be governed by a coordinated, regional planning process.

Our conclusion also garners support from an interpretation by the Department of Community, Trade and Economic Development (DCTED), the state agency charged with assisting local governments in implementing the

GMA.[20] It has also concluded that cities may not stymie the regional planning process with local plans which are inconsistent with the regional scheme. Although the DCTED regulations do not specifically address this issue, in a letter from Steve Wells of DCTED to Todd Carlson of the Washington State Department of Transportation, Wells explained DCTED's position on this issue:

> Once the cooperative regional planning process has culminated in the adoption of the RTP or amendments thereto, when any inconsistencies between the RTP and county-wide planning policies or county, city or town comprehensive plans are identified, we have taken the position that the RTPO should notify the county, city or town whose county-wide planning policy or comprehensive plan is inconsistent with the RTP and work with that jurisdiction or those jurisdictions to appropriately amend its policy or plan to develop consistency with the RTP.

DCTED recognizes that if local and regional planners are unable to achieve consistency, a regional plan that embodies the broad sweep of the planning efforts of local governments throughout the region should govern land use decisions. But although the Port and the PSRC are correct that the GMA does not advocate land use planning by "balkanized fiefdoms,"[21] neither does it allow regional planners to steamroll local comprehensive plans in favor of regional goals. The purposes of the GMA are met only if city, county, and regional planners cooperate and coordinate. When this process occurs, as it did here, the regional plan should

---

[20]"[W]hen a statute is ambiguous—as in the instant case—there is the well known rule of statutory interpretation that the construction placed upon a statute by an administrative agency charged with its administration and enforcement, while not absolutely controlling upon the courts, should be given great weight in determining legislative intent." *Hama Hama Co. v. Shorelines Hearings Bd.*, 85 Wn.2d 441, 448, 536 P.2d 157 (1975).

[21]Board Member Joseph Tovar aptly characterized the Cities' position as advocating a "city-centered universe," in which, "[i]f commonly held and acted upon by the four counties and seventy-eight cities in this region, . . . would perpetuate the type of 'uncoordinated and unplanned growth' that the GMA identified as a 'threat to the environment [and] sustainable economic development' of this state." *Port of Seattle v. City of Des Moines*, Final Decision and Order, Central Puget Sound Growth Management Hearings Board, No. 97-3-0014 at 11 (1997) (quoting RCW 36.70A.010).

reflect choices and goals endorsed by the majority of the city and towns within the region. To require unanimity among these jurisdictions or to invalidate a regional plan that does not reflect every aspect of every city plan within the region would defeat the clear purpose of the GMA.

Affirmed.

KENNEDY, C.J., and COLEMAN, J., concur.

Review denied at 140 Wn.2d 1022 (2000).