836

THE CITY OF DES MOINES, ET AL., *Appellants*, v. THE PUGET SOUND REGIONAL COUNCIL, ET AL., *Respondents*.

THE CITY OF DES MOINES, ET AL., *Appellants*, v. THE PORT OF SEATTLE, ET AL., *Respondents*.

THE CITY OF DES MOINES, *Appellant*, v. CENTRAL PUGET SOUND GROWTH MANAGEMENT HEARINGS BOARD, ET AL., *Respondents*.

THE AIRPORT COMMUNITIES COALITION, ET AL., *Appellants*, v. THE PORT OF SEATTLE, ET AL., *Respondents*.

*Peter J. Kirsch*; *John William Hempelmann* (of *Cairncross & Hempelmann, P.S.*); *Gary Neil McLean, Des Moines City Attorney* (*Thomas D. Roth* and *Perry M. Rosen* of *Cutler & Stanfield L.L.P.*, of counsel); *Michael R. Kenyon* and *Robert Franklin Noe* (of *Kenyon Law Firm*); *Londi K.*

*Lindell, Federal Way City Attorney; Wilton S. Viall III;* and *David Todd Hokit* (of *Curran Mendoza, P.S.*), for appellants.

*John Tayloe Washburn* and *Roger A. Pearce* (of *Foster Pepper & Shefelman P.L.L.C.*); *Linda J.N. Strout; Traci Marie Goodwin; Christine O. Gregoire, Attorney General,* and *Marjorie Taylor Smith, Assistant;* and *David Alan Bricklin* and *Jennifer A. Dold* (of *Bricklin & Gendler*), for respondents.

AGID, J. — This is the second of three actions brought by the cities surrounding the Seattle Tacoma International Airport against the Port of Seattle, the Puget Sound Regional Council, and the City of Sea-Tac—the entities responsible for approving and implementing the Sea-Tac expansion project. All three actions essentially allege "that the GMA [Growth Management Act] requires at least one public entity . . . to ensure that the Sea-Tac expansion project is consistent with the comprehensive plans of neighboring jurisdictions . . . all of which call for the reasonable mitigation of impacts from such a massive project."

In this appeal, which deals solely with the Port's obligations under the GMA and the State Environmental Policy Act (SEPA), the Cities contend that the trial court erred by (1) concluding that neither the GMA nor the Department of Community, Trade and Economic Development regulations require the Port Resolutions to comply with local comprehensive plans, regardless of whether they violate the GMA, (2) upholding the Central Puget Sound Growth Management Hearing Board's invalidation of several provisions of the Des Moines city plan based on the conclusion that they preclude the siting of an essential public facility in violation of RCW 36.70A.200(2), and (3) upholding the Port's and the

Federal Aviation Administration's (FAA) SEPA studies, which assume that the expansion will result in no additional passengers or operations and fail to analyze the environmental impacts of the expansion beyond the year 2010. We affirm the trial court.

## FACTS

The Port of Seattle is a special district governed by an elected commission and responsible for major marine and air transportation facilities in the Seattle area. In 1993, the Port initiated a Master Plan Update for Sea-Tac, which analyzed alternative means to improve airfield operating capacity in poor weather conditions, one of which was construction of a third runway. In 1995, the Port and the FAA issued a Draft Environmental Impact Statement (DEIS) as required by SEPA, and after public hearings, consultation with numerous agencies, and additional studies, the Port issued a Final EIS which identified the quantity of fill needed for construction of the runway, the various locations where the fill might be obtained, and all routes that might be used to haul the fill. Based on these studies, the Port Commission passed Resolution 3212, which adopted the Master Plan Update and granted approval to develop a third runway at Sea-Tac. Resolution 3212 also contained "a commitment to mitigate the impacts of the improvements at [Sea-Tac] based on the impacts identified in the Master Plan Update EIS."

After publication of the Final EIS (FEIS), the FAA issued its fiscal year 1996 Terminal Area Forecast (TAF) for the nation's airports. The TAF predicted levels of aircraft operations and passengers at Sea-Tac that exceeded the FEIS predictions. In response, the Port and the FAA revised the Sea-Tac aviation demand forecast, concluding that demand could be 17 percent greater than the FEIS forecast. Consequently, the FAA and the Port prepared a Supplemental EIS (SEIS). The draft SEIS, released in February 1997, concluded that detailed impacts could not be meaningfully assessed beyond 2010 for a number of reasons. But the

SEIS did contain a projection of impacts based on assumed steady growth rates to the year 2020, as well as a higher growth rate scenario. Des Moines, Burien, Federal Way, Normandy Park, and Tukwila appealed the adequacy of the EIS/SEIS under SEPA to the Port's Hearings Examiner, who determined that the purposes of SEPA were "well-served" by the Port's studies.

In Port Resolution 3245, the Port Commission reaffirmed Resolution 3212 and included a summary of the Commissioners' decision-making process and an updated and expanded list of mitigation measures. On July 3, 1997, the FAA issued a Record of Decision (ROD) approving the Port's Master Plan Update. The ROD was based on the EIS and SEIS and contained an analysis of the project impacts and a list of FAA-required mitigation. The ROD concluded that " 'all practical means to avoid or minimize environmental harm have been adopted through appropriate mitigation planning.' " On November 24, 1998, the Ninth Circuit upheld that FAA decision, including the aviation demand forecasting and the decision to analyze detailed impacts only through 2010.

Meanwhile, the Port had filed a petition with the Growth Management Hearings Board in February 1997 challenging the Des Moines comprehensive city plan on the theory that it would preclude expansion of Sea-Tac, an essential public facility, in violation of RCW 36.70A.200(2). The Port also asserted that the Des Moines plan was inconsistent with the regional plan, the King County comprehensive plan, and the multicounty planning policies. In an April 20, 1998 order, the Board again stated that the entire Des Moines plan violated RCW 36.70A.200:

> In addition to finding the Plan, as a whole, out of compliance with the requirements of RCW 36.70A.200, the Board found that two policies, 1-04-05 and 5-04-04, substantially interfered with the fulfillment of the GMA's transportation goal, RCW 36.70A.020(3). . . . These policies were invalidated.

The Board remanded the plan and instructed Des Moines to bring the plan into compliance with RCW 36.70A.200 and

achieve internal plan consistency. On remand, Des Moines amended only the two invalidated policies. At the hearing after remand, the Board determined that the Des Moines plan was still not in compliance with the GMA, reinstated its invalidity order, and recommended that the Governor impose sanctions on Des Moines if it did not bring its plan into compliance. The Des Moines City Council then amended 15 policy provisions, and the Board found the plan complied with GMA.

The Cities appealed the Board's and the Examiner's decisions to the King County Superior Court, which determined that neither the GMA nor the Department of Community, Trade and Economic Development regulations require the Port to comply with the Des Moines city plans, upheld the GMA Board's determination that several Des Moines plan policy provisions violated the GMA, and affirmed the Port's Hearings Examiner's conclusion that the Port's SEPA studies were adequate.

## DISCUSSION

### 1. The Port's Duty to Comply With Local Plans

The Department of Community, Trade and Economic Development (DCTED), the state agency with the principal responsibility for implementing the GMA, assists counties and cities in preparing comprehensive plans and development regulations[1] and promulgates administrative procedural criteria in the Washington Administrative Code.[2] In WAC 365-195-770(2), DCTED has directed that "[e]xcept where any specific enactment may state the contrary," special districts, such as the Port district, must "comply with the comprehensive plans and development regulations developed under the [GMA]." The Cities contend that "[c]learly, WAC 365-195-770(2) interprets the GMA as setting forth a legal requirement that port districts comply with local comprehensive plans."

---

[1] *See* RCW 36.70A.190.

[2] *See* ch. 365-195 WAC.

The trial court noted that DCTED regulations apply by their terms only to cities and counties,[3] and that even if the regulations did apply to the Port, they would "require nothing of it" because they are advisory.[4] The court went on to conclude, however, that:

> If plaintiff-petitioners are correct that the [D]CTED regulations provide persuasive authority concerning the application of the GMA to the current conflict . . . [t]he regulations as a whole cannot reasonably be read to support their position that the Port should defer to their comprehensive plan or plans, except in the very limited situation where it is proven that their own plans have been developed in conformity with the GMA. . . . A planning jurisdiction must demonstrate that it has complied with the act, particularly by developing plans in a cooperative fashion and in reasonable conformity to county-wide and RTPO [Regional Transportation Planning Organization] planning.

The court did not determine, as the Cities argue, that "the Port has absolutely no obligation under the GMA to resolve conflicts with local plans." On the contrary, it concluded that if the cities engage in the cooperative planning process required by the GMA and produce plans which reflect this coordinated approach and do not conflict with the Regional Transportation Plan (RTP), the Port should, according to the DCTED regulations, have an affirmative obligation to comply with the terms of these plans.[5] The DCTED regulations and the GMA itself support this conclusion.

___

[3] RCW 36.70A.040.

[4] WAC 365-195-030 states that "[t]his chapter makes recommendations . . . but compliance with the requirements of the [GMA] can be achieved without using all of the suggestions made here or by adopting other approaches." But because the GMA itself directed DCTED to develop these regulations, they should receive some deference. *See Green River Cmty. Coll. Dist. No. 10 v. Higher Educ. Pers. Bd.*, 107 Wn.2d 427, 438, 730 P.2d 653 (1986) ("a heightened degree of deference is appropriate where the agency's construction of a statute is within the agency's field of expertise").

[5] At the time of this decision, the court was faced with a Des Moines city plan which actively opposed the runway proposal and would have prevented any proposal which would have had a "negative impact" on its residents or businesses. The trial court noted that the "policies at issue in the Des Moines Plan did not require mitigation, but instead directed the City to oppose any new facilities at [Sea-Tac] that increased the impacts to the City of Des Moines."

██ WAC 365-195-340(2)(b)(iv) provides that "[w]here essential public facilities may be provided by special districts, . . . cities and counties should adopt provisions for consultation to ensure that such districts exercise their powers in a way that does not conflict with the relevant comprehensive plan." In addition, the regulations direct that the "process should provide for a cooperative interjurisdictional approach to siting of essential public facilities of a county-wide, regional, or state-wide nature, consistent with county-wide planning policies."[6] Also, as a proponent of a regional transportation project, the Port is required by RCW 47.80.030(3) to act consistently with the RTP and other regional transportation strategies. As explained in the companion case against the Puget Sound Regional Council, although an RTP may not unilaterally "trump" a city plan, if a conflict between a city plan and an RTP exists after the planning process is completed, the city must revise its plan to comply with the regional plan. *City of Des Moines v. Puget Sound Reg'l Council*, 97 Wn. App. 920, 988 P.2d 993 (1999). After consistency is achieved, the Port will have a duty to comply with both the RTP and the local plans, regardless of whether they require mitigation which the Port finds either difficult or expensive.[7]

2. Application of RCW 36.70A.200(2)

The Cities next contend that RCW 36.70A.200(2), which provides that "[n]o local comprehensive plan or development regulation may preclude the siting of essential public facilities," does not apply to the Sea-Tac expansion. The Cities concede that this provision provides protection from local comprehensive plans that would preclude siting of essential public facilities (EPFs), but they argue that RCW 36.70A.200(2) is inapplicable here because it does not apply to expansions, or to "remote, off-site 'necessary support activities,'" and that the Cities' plan would not have "pre-

---

[6] WAC 365-195-340(2)(b)(ii).

[7] As urged by the Port in its motion for reconsideration/clarification, we clarify that these duties are limited to Port proposals for specific projects within local jurisdictions in accordance with state and federal law.

cluded" the project. Relying on WAC 365-195-340, which directs that "the broadest view should be taken of what constitutes a public facility," the Board rejected this argument.[8]

## Whether RCW 36.70A.200(2) Applies to Improvements or Expansions of EPFs

RCW 36.70A.200(2) states that "[n]o local comprehensive plan or development regulation may preclude the siting of essential public facilities," and RCW 36.70A.200(1) defines essential public facilities as including "those facilities that are typically difficult to site, such as airports." The Cities argue that because this provision makes no mention of "expanding" or "improving" EPFs which have already been sited, neither the Board nor the trial court was authorized to expand the clear terms of the GMA.[9] The Cities also argue that a recent legislative enactment supports its claim that a significant difference exists between construction and expansion. In 1998, seven months after the Board considered this issue, the Legislature enacted House Bill 1487, which added a new section, Section 7, to chapter 47.06 RCW which stated that "[i]mprovements to facilities and services of state-wide significance . . . are essential state public facilities under RCW 36.70A.200." The Cities claim that this amendment supports their argument that prior to this amendment, improvements to airports were *not* considered EPFs.

There are two problems with this argument. First, because of the political controversy generated by the expansion, the bill's co-sponsor explained that the transportation committee had to agree that the amendment would not deal with airports. Thus, the 1998 amendment specifically excludes improvements to airports from the EPF definition,

---

[8] We accord substantial weight to the Board's findings. *See N.W. Steelhead & Salmon Council of Trout Unlimited v. Dep't of Fisheries*, 78 Wn. App. 778, 786-87, 896 P.2d 1292 (1995).

[9] The Cities point out that the Washington Supreme Court has indicated that the GMA does not "contain the requirement that it be liberally construed." *Skagit Surveyors & Eng'rs v. Friends of Skagit County*, 135 Wn.2d 542, 565, 958 P.2d 962 (1998).

and this amendment has no bearing on the Sea-Tac expansion. Second, the Cities do not acknowledge the likely possibility that the amendment was a clarification, and not an alteration, of the previous law. As the Washington Supreme Court has noted:

> When an amendment clarifies existing law and where that amendment does not contravene previous constructions of the law, the amendment may be deemed curative, remedial and retroactive. This is particularly so where an amendment is enacted during a controversy regarding the meaning of the law.[10]

If this amendment is a clarification, as the controversy surrounding the issue may suggest, then the Port has a valid argument that HB 1487 simply explains that the Legislature had always intended that improvements to EPFs should be protected under RCW 36.70A.200. Nevertheless, the trial court correctly reasoned that because of the conflicting conclusions that can be drawn from this amendment, "neither the rule of 'expression unius est exclusio alterius' nor the argument that the EPF definition has now been legislatively clarified to include airport improvements" is available to either party.

■ Deprived of its HB 1487 argument, the Cities are left with a claim that the plain language of RCW 36.70A.200(2) says nothing about "expanding" or "improving" EPFs which have already been sited. But the DCTED regulations, to which the Cities urge this court to defer on other points, indicate that in "the identification of essential public facilities, the broadest view should be taken of what constitutes a public facility."[11] Accordingly, the Board determined that the third runway was an essential public facility. We defer to the Board's interpretation of the law and conclude, as the trial court did, that "the requirements of RCW 36.70A-.200(2) apply to all essential public facilities (EPFs),

---

[10] *Tomlinson v. Clarke*, 118 Wn.2d 498, 510-11, 825 P.2d 706 (1992) (footnotes omitted).

[11] WAC 365-195-340(2)(a)(i).

whether or not the EPF was in existence prior to the GMA."
This conclusion comports with the fundamental reasoning
behind identifying EPFs and giving them special signifi-
cance under the GMA—the fact that cities are just as likely
to oppose the siting of necessary improvements to public
facilities as they are the siting of new EPFs.

Whether EPFs Include "Necessary Support Activities"

■ The Cities argue that even if the EPF provision
applies to the Sea-Tac expansion, the "critical issue" before
this court is "whether the trial court and the Growth Board
erred in determining that this provision is so expansive so
as to cover remote, off-site 'necessary support activities.'"
The trial court affirmed the Growth Board's ruling that
off-site dirt-hauling activities conducted by the Port within
Des Moines are protected under RCW 36.70A.200. The
Cities claim that because "support activities" do not appear
in the GMA, the Board and the trial court cannot add them.
But again, the DCTED regulations urge that an expansive
view should be taken of essential public facilities. WAC
365-195-340(2)(a)(i) indicates that identification of EPFs
should include "the full range of services" provided both by
government and by private entities. In addition, section
340(2)(c) states that no comprehensive plan may "directly
or indirectly" preclude the siting of an essential public
facility. The legislative purpose of RCW 36.70A.200(2)
would be defeated if local governments could prevent the
construction or operation of an EPF. Thus, if an activity is
indeed "necessary" to a construction of an EPF, a local plan
may not stop it from occurring. The Port has convincingly
demonstrated that the runway cannot be built without
constructing a site that is level with the existing airport,
and that this construction will require hauling dirt through
the cities surrounding Sea-Tac to the site itself. The Port
will undoubtedly be required to mitigate the impacts of this
construction on the surrounding communities, but because
construction is impossible without these support activities,
the Cities cannot stop them from occurring.

The Definition of "Preclude"

To determine the precise meaning of the word "preclude" in RCW 36.70A.200, the Board referred to a previous decision which defined it as "render impossible or impracticable." The Board focused on the word "impracticable," because the Legislature would have used the word "prohibit" instead of "preclude" if it had intended to allow the Cities' plans to fall just short of rendering the siting absolutely impossible. Using *Merriam Webster's Collegiate Dictionary*, the Board defined "impracticable" as "incapable of being performed or accomplished by the means employed or at command." The Board therefore interpreted "preclude" to mean "incapable of being accomplished by the means at the Port's command." The Cities claim that under this "expansive definition," an EPF proponent can "unilaterally control what 'precludes' its project, by claiming that contested comprehensive plan provisions simply would be too costly or time-consuming to comply with." This is not a tenable reading of the Board's decision.

At the time the Board and the trial court considered this issue, the Des Moines plan intended to "oppose" construction of the third runway.[12] Now that the plan has been amended to allow construction, but to require mitigation of its adverse effects, the Cities are correct that the Port will have to comply with the Cities' reasonable permitting and mitigation requirements. The fact that these requirements may make the expansion more costly does not relieve the Port of these obligations.

3. Adequacy of SEPA Analysis

Finally, the Cities contend that the Port's 1997 SEIS violates SEPA because it is premised on the assumption that the expansion will not increase the number of people or aircraft operations at the airport, and because it fails to analyze the effects of the project after the year 2010. The Port argues that the Cities are collaterally estopped from

---

[12] The trial court indicated that the "record before the Board shows that the City of Des Moines developed and adopted certain comprehensive plan policies and development regulations which would permit it to stop trucks moving fill, and thereby to directly or indirectly prevent [Sea-Tac] expansion."

relitigating this issue because they have already done so in *City of Normandy Park v. Port of Seattle*,[13] an unpublished 1998 Ninth Circuit decision. In that case, the Cities appealed an FAA decision granting final approval to the Port's Master Plan development for the Sea-Tac expansion, arguing that it "improperly relied on a 'no growth' demand model and a limited prediction forecast thereby failing to accurately assess the project's environmental impacts and necessary mitigation measures."[14] The Ninth Circuit analyzed this claim under the federal Airport and Airway Improvement Act (AAIA) and several similar challenges brought against the FAA and concluded that the FAA properly approved the Port's Master Plan.

▪ The collateral estoppel doctrine prevents relitigation of an issue in state court after the party against whom the doctrine is applied has had a full and fair opportunity to litigate his or her case in federal court.[15] But here, the fact that the federal court concluded that the Port's Master Plan satisfied the AAIA has little bearing on the Port's obligations under SEPA because, as the Cities argue, SEPA and the AAIA "have markedly different obligations."[16] The Ninth Circuit analyzed the Cities' claims to determine whether, under the AAIA, "every reasonable step has been taken to minimize the adverse effects"[17] of the expansion and whether the project is consistent with state plans. Although the SEPA inquiry is similar, SEPA requires a

[13] No. 97-70953, 1998 U.S. App. LEXIS 30463, 1998 WL 833628 (9th Cir. Nov. 24, 1998).

[14] 1998 U.S. App. LEXIS 30463, at *3-4, 1998 WL 833628, at *1.

[15] *See Hanson v. City of Snohomish*, 121 Wn.2d 552, 573-74, 852 P.2d 295 (1993) (citing *Standlee v. Smith*, 83 Wn.2d 405, 518 P.2d 721 (1974)).

[16] Substantive differences between two legal schemes do not necessarily preclude application of the collateral estoppel doctrine, *Liberty Bank of Seattle, Inc. v. Henderson*, 75 Wn. App. 546, 548, 559-60, 878 P.2d 1259 (1994), *review denied*, 126 Wn.2d 1002 (1995), but when the statutes are sufficiently different that they preclude the full litigation of an issue, applying the doctrine would result in an injustice. *See Southcenter Joint Venture v. Nat'l Democratic Policy Comm.*, 113 Wn.2d 413, 418, 780 P.2d 1282 (1989).

[17] *Normandy Park*, 1998 U.S. App. LEXIS 30463, at *3, 1998 WL 833628, at *1 (quoting 49 U.S.C. § 47106(c)(1)(C)).

more detailed procedural inquiry. The question of the Port's compliance with SEPA therefore requires separate analysis in state court.

SEPA is a procedural statute designed to ensure that local governments consider the environmental and ecological effects of major actions to the fullest extent.[18] SEPA's purpose is to provide decision makers with all relevant information about the potential environmental consequences of their actions and to provide a basis for a reasoned judgment that balances the benefits of a proposed project against its potential adverse effects. An EIS is not to be a "compendium of every conceivable effect or alternative to a proposed project,"[19] but it must include a " ' "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the agency's decision.' "[20]

■■ The Port and the FAA issued their joint Final EIS for the Airport Master Plan Update in February 1996. Later that year, after determining that additional study was necessary based on new forecasts for the nation's airports conducted by the FAA, they issued a Supplemental EIS (SEIS) in February 1997 and a Final Supplemental EIS in May 1997. The Cities alleged that these studies were inadequate because they assumed that the additional runway would not result in an increase of passengers or airport operations and because they did not evaluate the impacts of the expansion beyond the year 2010. After a five-day hearing before the Hearings Examiner, the Examiner concluded that the "purpose of SEPA was well served with this SEIS." We conduct a de novo review of the Examiner's conclusion,[21] qualified by SEPA's statutory requirement

---

[18] *See* RCW 43.21C.030.

[19] *Toandos Peninsula Ass'n v. Jefferson County*, 32 Wn. App. 473, 483, 648 P.2d 448 (1982).

[20] *Org. to Preserve Agric. Lands (OPAL) v. Adams County*, 128 Wn.2d 869, 875, 913 P.2d 793 (1996) (quoting *Weyerhaeuser v. Pierce County*, 124 Wn.2d 26, 38, 873 P.2d 498 (1994)).

[21] *Klickitat County Citizens Against Imported Waste v. Klickitat County*, 122 Wn.2d 619, 632-33, 860 P.2d 390, 860 P.2d 1256 (1993).

that agency determinations of EIS adequacy are entitled to substantial weight.[22] The adequacy of an EIS is assessed under the "rule of reason,"[23] which requires a " 'reasonably thorough discussion of the significant aspects of the probable environmental consequences' of the agency's decision."[24]

"No Growth" Assumption

The Final EIS concluded that regardless of whether the Port took "no action" or whether it constructed the airport expansion, the same number of passengers would use the airport. This forecast was prepared by Stephen Allison, a Senior Aviation Planner for P&D Aviation, the company that prepared the Flight Plan EIS issued by the Port and the Puget Sound Regional Council (PSRC) in 1992. Allison has 30 years of experience in the aviation planning and consulting field and has served as project planner or lead aviation planner on the development of over 30 airport master plans and regional aviation system plans. Preparing forecasts of aviation activity for individual airports and multiple-airport regions is his specialty.

At the hearing, Allison explained that when he prepares a forecast, he develops a detailed mathematical model that assesses the relationship between airport activity and the factors that have been shown to strongly affect it, and then evaluates this model to ensure that it accurately forecasts aviation demand and passes statistical tests. He also considers a wide variety of other factors, including input from the aviation community, the local and national economies, airfares, telecommunications, and aviation demand in the region. He then compares the master plan forecast with forecasts prepared in other studies and by the FAA and evaluates differences in the purpose of the forecast, the forecast approach, and assumptions.

---

[22] RCW 43.21C.090; *OPAL*, 128 Wn.2d at 875.

[23] *Klickitat*, 122 Wn.2d at 633.

[24] *Id.* (quoting *Cheney v. City of Mountlake Terrace*, 87 Wn.2d 338, 344-45, 552 P.2d 184 (1976)).

In this case, Allison determined that three factors at Sea-Tac have the greatest predictive value for estimating future aviation demand: population of the service area, personal income in that area, and average airfares. The models he developed were tested against historical activity at Sea-Tac with a 99 percent correlation and accepted by the FAA for use in preparation of the EIS/SEIS. The forecasts were also reviewed by Landrum & Brown, the consultant selected by the Port and the FAA to prepare the EIS and SEIS. Other expert testimony at the hearing indicated that Allison's methodology has been used at most of the country's major airports.

The Cities presented the testimony of Dr. Clifford Winston, a Senior Fellow at the Brookings Institution, who stated that expanded airport facilities would cause a growth in demand for air travel. The Port's experts responded that aviation demand is not caused by expanded facilities as long as there is sufficient airport capacity to serve the passengers who wish to fly.

The Examiner found the testimony of the Port's experts credible and concluded that the "Port and the FAA used a forecasting methodology for the SEIS that was consistent with industry-accepted standards and was proven reliable over time. . . . The decision to measure aviation demand by the aviation forecast methodology chosen is legally adequate under the rule of reason." In addition, the Examiner noted that the difference of opinion between the Cities' expert witness and the Port's witnesses was discussed in the EIS, which "allowed the decision-makers to be informed on this issue prior to making their decisions."[25] We agree. Although the conclusion that an expansion at Sea-Tac will not create growth initially appears counterintuitive, the purpose of the expansion is not to increase capacity; it is to decrease delays in poor weather. As such, it is entirely plausible that this expansion will simply improve efficiency, not promote growth.

---

[25] The Final SEIS included an appendix that analyzed environmental impacts if increased airport capacity did indeed result in higher aviation activity.

The Cities cite several federal cases in support of their argument that the Sea-Tac expansion will cause additional aviation demand. In those cases, however, the courts reasonably held that new freeway exchanges and bridges would spur development and increase growth in the area, which would result in increased traffic on the highways themselves. This does not necessarily hold true for Sea-Tac. Although Sea-Tac will become more efficient when it constructs an extra runway to decrease delays in poor weather, it does not necessarily follow that more people from this region will decide to fly, or that people from other areas will be attracted to Sea-Tac for that reason. As the Eleventh Circuit concluded when considering the impacts of an Atlanta airport runway extension, although an increase in capacity would undoubtedly occur given the projected growth of the region, "[t]his increased growth . . . is not attributable to an extended runway. The effect caused by the runway extension will be a higher percentage of safe landings, not a higher number of planes landing."[26] This reasoning applies here.[27]

■ The Port and the FAA are agencies with expertise in forecasting aviation demand and should receive deference in choosing the appropriate methodology for forecasting aviation activity.[28] When an agency is presented with conflicting expert opinion on an issue, it is the agency's job, and not the job of the reviewing appellate body, to resolve those differences.[29] We commend the Examiner on his

---

[26] *C.A.R.E. Now, Inc. v. Fed. Aviation Admin.*, 844 F.2d 1569, 1575 (11th Cir. 1988).

[27] The only airport case the Cities cite involves a multiple-airport system in Washington D.C. *See Citizens for Abatement of Aircraft Noise, Inc. v. Metro. Wash. Airports Auth.*, 718 F. Supp. 974 (D.D.C. 1989) (subsequent history omitted). As the Port points out, passengers in that region have an option, so new gates and terminal expansions may indeed lure passengers away from neighboring airports and increase growth.

[28] *Seattle Cmty. Council Fed'n v. Fed. Aviation Admin.*, 961 F.2d 829, 833-34 (9th Cir. 1992).

[29] *Webb v. Gorsuch*, 699 F.2d 157, 160 (4th Cir. 1983). Washington courts have

thorough analysis of this issue and defer to his finding that the Port's "no growth" presumption was a reasonable forecast.

## Decision to Limit Analysis of Future Impacts to 2010

The Port explained to the Examiner that at the time the Master Plan Update EIS was prepared in 1994, airfares at Sea-Tac were relatively stable. Thus, the 1996 EIS analyzed effects of the proposal through 2020. But shortly thereafter several factors combined to add "significant uncertainty to the planning efforts of those professionals charged with attempting to meaningfully evaluate long-term impacts under SEPA and NEPA [National Environmental Protection Act]." Some of these factors included a drop in nationwide airfares, Boeing's decision to discontinue production of the MD-80 aircraft, the arrival of Southwest Airlines, one of the nation's lowest airfare airlines, and "investments in noise and air pollution research which are likely to significantly reduce engine noise in new aircraft . . . starting in the year 2005." In light of these events, the EIS consultants agreed with the project manager that they could not "reasonably forecast" the impacts of the runway project beyond the year 2010.[30] The Cities point out that because the runway will not be completed until 2004 or 2005, the Port has evaluated its actual impacts for only five years. The Examiner disagreed with the Cities' views, concluding that "a more proper context is to review the length of the planning period from the date of the EIS in 1996, rather than the year 2004." Thus, the Examiner viewed the Port's planning period as ranging over 13 years.

WAC 197-11-060(4) explains that "SEPA's procedural provisions require the consideration of 'environmental'

---

followed federal NEPA cases when construing SEPA. *Eastlake Cmty. Council v. Roanoke Assocs.*, 82 Wn.2d 475, 488 n.5, 513 P.2d 36, 76 A.L.R.3d 360 (1973).

[30] The Port did include an appendix, however, that contained "an extrapolated estimate of possible impacts in the year 2020 in order to provide decision-makers with the analysis of possible impacts through the year 2020 prior to their taking action."

impacts . . . , with attention to impacts that are likely, not merely speculative." This subsection further directs that "[a]gencies shall carefully consider the range of probable impacts, including short-term and long-term effects. Impacts shall include those that are likely to arise or exist over the lifetime of a proposal or, depending on the particular proposal, longer." "Probable" is defined in a later section as "likely or reasonably likely to occur, as in 'a reasonable probability of more than a moderate effect on the quality of the environment' . . . . Probable is used to distinguish likely impacts from those that merely have a possibility of occurring, but are remote or speculative."[31]

Mary Vigilante, the EIS Project Manager, testified that because there were rapid changes in aviation activity during the mid-1980s at Sea-Tac, and because quantification of environmental impacts depends on total aviation activity, aircraft types and engines, and the timing of flights, detailed analysis of the years beyond 2010 in the EIS would be speculative and could lead to a substantially inaccurate evaluation of environmental effects. The Examiner found her testimony credible. Gene Peters, a director with Landrum & Brown, similarly testified that the volatility in airfares, forecasts, fleet mix, and other areas in the period following 1994 made it difficult in 1996 to predict with substantial accuracy impacts beyond the year 2010. As for noise impacts, the experts testified that although it was theoretically possible to run noise contours, the reliability of the models diminishes as the length of time is expanded. The Cities did not rebut this testimony.

The Examiner's determination that this analysis satisfied SEPA's procedural requirements is supported by ample evidence in the record. The fact that the Port included an appendix that estimated the effects of the expansion through the year 2020 based on extrapolated data establishes that the Port did what it reasonably could to provide the decision makers with reliable information about the

[31] WAC 197-11-782.

potential environmental consequences of their actions. Anything more would have been too speculative, and thus the EIS was adequate under SEPA.

Affirmed.

KENNEDY, C.J., and COLEMAN, J., concur.

Reconsideration granted and opinion modified February 23, 2000.

Review denied at 140 Wn.2d 1027 (2000).

[Nos. 18743-8-III; 18747-1-III;    Division Three.    July 3, 2001.]
18759-4-III; 18776-4-III;
18809-4-III; 19063-3-III.